THE PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* NELSON PIERCE, NELSON PIERCE AND THE DEAD WHALE ASPHALTUM MINING COMPANY *v.* CHARLES MORRILL.

LANDS BELONGING TO THE STATE. — The lands belonging to the State are distinguishable into two general classes; First—Those which it owns by virtue of grants from the United States; Second—Those which it owns by reason of its sovereignty. The class of lands belonging to the State by reason of its sovereignty includes the shore of the sea, and of its bays and inlets, in the common law definition of the word "shore."

SWAMP LANDS. — Lands which are swampy or subject to such periodical overflows as to injure or destroy the crops, belong to the State by virtue of the Act of Congress of September 28th, 1850, commonly called the "Arkansas Act."

LANDS OFFERED FOR SALE BY ACT OF 1858.—The Act of April 21st, 1858, for the sale of "swamp and overflowed lands," does not provide for the sale of any lands except those which fall within the description of the Arkansas grant of 1850.

PROVISO TO FIRST SECTION OF SAID ACT. — The proviso to the first section of the Act of April 21st, 1858, for the sale of "swamp and overflowed lands," refers only to the narrow channels, within the ebb and flow of the tide, which thread the "swamp lands" known as "salt marsh."

PROVISO TO AN ACT.—The proviso to an Act is to be read in the light of the subject matter of the Act.

LANDS OFFERED FOR SALE BY ACT OF 1859.—The Act of April, 1859, amendatory of the Act of April 21st, 1858, for the sale of swamp and overflowed lands of this State, only refers to such lands as are offered for sale by the Act of April 21st, 1858, of which it is amendatory.

LANDS OFFERED FOR SALE BY ACT OF 1861.—The Act of May 13th, 1861, "for the reclamation and segregation of swamp and overflowed land," etc., provides only for purchases to be made after the passage of the Act, and the segregation of the lands in accordance with the nineteenth and twentieth sections of the Act.

SALES OF LANDS RATIFIED BY ACT OF MAY 14, 1861.—The word "tide lands," used in the Act of May 14th, 1861, entitled "an Act to provide for the sale of the marsh

and tide lands of this State," only refers to such tide lands as are subject to periodical overflow, but are susceptible of reclamation, so as to be made valuable for agricultural purposes.

SALE OF LAND OVERFLOWED BY TIDES. — No provision has been made by law for the sale of the lands owned by this State by virtue of its sovereignty, on the shore of the sea and its bays and inlets, which are usually overflowed by the neap tides.

INJUNCTION TO PREVENT INJURY TO STATE LANDS. — In an action brought by the State to procure the cancellation of a patent for lands sold without authority of law, where the person claiming under the patent is engaged in removing mineral from the land, the State is entitled to an injunction restraining the defendant from removing the same.

PARTIES PLAINTIFF IN ACTION TO ANNUL A PATENT.—Parties who have a common interest in annulling a patent, although they have no joint interest in the land adverse to the patentee, may be joined as plaintiffs in action to procure its cancellation.

SAME.—In an action brought to annul a patent for land sold without authority of law, the State, and persons who have a right to mine on the land under the mining laws of this State, may be joined as plaintiffs.

DEMURRER TO ENTIRE BILL.—If a demurrer is to the whole bill, and is good as to a part, but bad as to part, it should be overruled.

DEMURRER TO BILL FOR MULTIFARIOUSNESS.—Where the parties joined as plaintiffs are all interested in the principal question raised in the bill, and the issues tendered are simple, and a multiplicity of suits may be avoided, a demurrer for multifariousness will not be sustained.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

This action was commenced in July, 1862. The complaint averred that on the 19th day of March, 1861, the relators Pierce, Massini, Trussell, and Mangard, in accordance with the general mining laws and customs of this State, took up as mining claims a certain parcel of land on the sea shore, between the lines of ordinary high and low water, a portion of which, a strip one thousand five hundred feet long, is embraced within the land described in the patent issued to defendant, and that the parcel of land taken up they designated as the Asphaltum Mining District; that they planted stakes to mark the limits of their claim, and placed written notices thereon, stating that the same had been taken up by them as a mining claim, and subscribed their names to the notices, and that they then and there adopted mining regulations for the government of the mines and miners in the district; that in August and September, 1861, Mangard sold his interest in the mining claim to

43

Garcia, and Trussell sold his interest to Morton; that on the 21st day of October, 1861, Pierce, Massini, Morton, and Garcia, were duly incorporated under the laws of this State as a mining corporation, under the name of the Dead Whale Asphaltum Mining Company, for the purpose of working the asphaltum mines in said district, which company is one of the plaintiffs; that after taking up the claim, and prior to the incorporation, Pierce and the others worked the mines, taking the asphaltum therefrom, and afterwards the corporation continued to do the same; that October 1st, 1861, defendant Morrill commenced an action against Pierce and the others to recover possession of two hundred and fifty tons of asphaltum, of the value of three thousand seven hundred and fifty dollars, and for two thousand dollars damages, and October 30th, 1861, commenced another action against Pierce and the others to recover possession of one hundred other tons of asphaltum, of the value of fifteen hundred dollars, and five hundred dollars damages; that in December, 1861, Morrill commenced another action against the same parties to recover eight thousand five hundred dollars damages for the alleged wrongful taking and conversion of two other lots of asphaltum in April and June, 1861, from the land covered by the patent; that in the two first actions the defendants had answered, setting up that the corporation owned the asphaltum, and in the third, Pierce only had been served with process, and had answered, setting up that the asphaltum belonged to him, Morton, Garcia, and Massini; that November 8th, 1861, the Dead Whale Asphaltum Mining Company commenced an action against Johnson and Baker to recover possession of one hundred tons of asphaltum, alleged to have been wrongfully detained by them, and Johnson and Baker had answered, setting up that the asphaltum was the property of Morrill, and that they were his bailees; that in all of said actions said Morrill claimed that the asphaltum in question therein was taken from the beds or deposits within the limits of the land described in his patent, and that by virtue of the patent he was the owner thereof, and that the sole basis of his right of recovery was the patent.

The complaint further averred that plaintiffs were advised and believed that relator Pierce and the Dead Whale Asphaltum Mining Company cannot avail themselves in said actions of the defense that the patent is void, or was issued without authority of law, and that defendant Morrill threatens and intends to force the said actions to trial at the earliest possible time.

The complaint prayed that the patent be cancelled and vacated, and that defendant Morrill and his attorneys be restrained by injunction from further prosecuting said actions until the matter could be determined, and that defendant Morrill, his agents and workmen, be enjoined from excavating or removing from the land embraced in said Dead Whale District any portion of the asphaltum therein lying and being.

A preliminary injunction was granted in accordance with the prayer of the complaint by the County Judge of San Francisco, on the 25th of July, 1862.

Defendant demurred to the complaint because relator Pierce and the Dead Whale Asphaltum Mining Company were improperly united as plaintiffs with the People, and because several causes of action were improperly united in the complaint.

Defendant moved in the District Court for a dissolution of the injunction, and on the 3d day of November, 1862, the same was dissolved.

From the order dissolving the injunction plaintiffs appealed.

Defendant's patent on its face purported to have been issued in pursuance of the Act of April 21st, 1858, entitled "An Act to provide for the sale and reclamation of the swamp and overflowed lands of this State," and in the patent the lands are called "State tide lands."

Defendant, in the affidavit attached to his application for the purchase of the patented land stated : " That to the best of his knowledge and belief, said tract was overflowed during the year 1850, and judging from the indications of overflow and the statements of others, every forty acre lot, or its equivalent legal subdivision, embraced in said tract, was the greater part swamp or swampy, or subject to inundation at the planting,

growing, or harvesting season, so as to endanger, injure, or destroy the crops, taking the average season for a reasonable number of years prior to 1850."

The other facts are stated in the opinion of the Court.

*Eugene Casserly,* for Appellants.

At the commencement of the proceedings of the respondent, March, 1861, which resulted in the issuing of the patent to him, the statutes in force were the Act of April 21, 1858, (Laws of 1858, p. 198), and the Act of April 18, 1859, (Laws of 1859, p. 340.) Pending the proceedings and after the making of the second or amended survey of April 9, and previous to the filing of respondent's amended affidavit in the office of the County Surveyor, May 20, a third Act was passed May 14, 1861, which took effect immediately, entitled "An Act to provide for the sale of the marsh and tide lands of this State."

The question to be determined by this Court is, whether under these Acts there was any authority to sell and patent lands of the character of the premises here, and which, though denominated in the patent "State tide lands," are, as to a small part, the sea beach between high and low water mark, continually washed by a heavy surf—and as to the remainder, the bottom of the sea under the navigable waters of the Pacific Ocean, extending out to a depth of one hundred fathoms; the whole being utterly incapable of cultivation or of reclamation for any such purpose.

The title of the Act of April 21, 1858, is: "An Act to provide for the sale and reclamation of the swamp and overflowed lands of this State." Section one is as follows:

" The swamp and overflowed lands belonging to this State, or that may hereafter be granted to this State by Act of Congress entitled 'An Act to enable the State of Arkansas, and other States, to reclaim the swamp lands within their limits,' passed September twenty-eighth, eighteen hundred and fifty, shall be sold at the rate of one dollar per acre, in manner

prescribed by this Act, and the proceeds of the sales thereof, under this or any former Act, shall be paid into the Treasury of this State, as State revenues, and shall be credited to the account of a swamp land fund, to be appropriated for the reclamation of said lands, as the Legislature may hereafter direct ; *provided*, that, if upon the survey of such lands, any portion thereof shall be found to be lands belonging to the State by right of her sovereignty, the moneys arising therefrom shall be paid into the Treasury of the State as other State revenues."

The " swamp and overflowed lands" mentioned in the beginning of this section are undoubtedly lands within the meaning of the Act of Congress of September 28, 1850. (Brightley Dig. 492, §201, etc.)   The peculiarity of the language used, " belonging to this State, or that may hereafter be granted to this State by Act of Congress," etc., was undoubtedly owing to an impression which seems to have been prevalent that some further legislation of Congress, or at least some proceeding by virtue of that Act, as the issuance of a patent, (Brightley Dig. 492, §202,) was necessary to vest in this State the swamp and overflowed lands of the United States within her limits ; an impression which was corrected for the first time in *Summers* v. *Dickinson*, 9 Cal. 555.

" Any person who may be entitled by the laws of this State to become a citizen thereof, wishing to purchase land under the provisions of this Act, shall file an affidavit in the Surveyor's office of the county in which the land sought to be purchased, or the larger portion thereof, is situated, that he has not entered any other land under the provisions of this Act, or under the provisions of an Act passed April twenty-eighth, one thousand eight hundred and fifty-five, entitled 'An Act to provide for the sale of the swamp and overflowed lands belonging to this State,' which, with the land sought to be purchased, shall exceed three hundred and twenty acres ; and that he does not know of any legal or equitable claim other than his own to the land sought to be purchased ; that such purchase is sought for the purpose of settlement and reclamation by affiant ;

and that he has not directly nor indirectly made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title he may acquire from the Government of the State should inure, in whole or in part, to the benefit of any person except himself. He shall then cause the land sought to be purchased to be surveyed; or, in case of a previous legal survey, shall cause the said survey to be approved and certified by the County Surveyor of the county in which such land, or the larger portion thereof, is situated."

The requirement that the affidavit shall set forth that " such purchase is sought for the purpose of settlement and reclamation," is·in effect a provision that only those lands of either class which are susceptible of " settlement or reclamation," are within the Act, or liable to be sold by virtue thereof. So, as to the operation of similar requirements in the Practice Act, as to the affidavits necessary to be filed before issuing an attachment, or an order to the Sheriff for the claim and delivery of personal property. And the Act by its title is for the " sale and reclamation of the *swamp and overflowed* lands of this State."

By the Act of April 18, 1859, this section of the Act of 1858 was amended; one change being that the passage just quoted was stricken out, and, in lieu thereof, the affidavit was required to set forth that " every forty acre lot, or its equivalent subdivision of the land sought to be purchased, is· the greater part swamp or swampy, or subject to inundation at the planting, growing, or harvesting seasons, so as to endanger, injure, or destroy the crops, taking the average season for a reasonable number of years prior to the year one thousand eight hundred and fifty, as a rule of determination."

The effect of this amendment is obvious. It is to substitute for the general statement that the land was capable of " settlement and reclamation," in which too much was left to the opinion of the affiant, and too little was·called for as to the specific character of the land in that respect—a much more particular description of it as to the greater part of every forty

acre lot or its equivalent subdivision, with reference to its being "swampy, or subject to inundation at the planting, growing, or harvesting seasons, so as to endanger, injure, or destroy the crops," and hence to its capability for bearing crops, if reclaimed by drainage, or protected against inundation. The amendment therefore pointedly confirms and secures the leading principle of the Act of 1858—that only those lands of the State, whether belonging to it by Act of Congress, or by virtue of her sovereignty, which are susceptible of reclamation for purposes of cultivation, are within its provisions. Compare also Act of May 13, 1861, to provide " for the reclamation" etc., "of swamp" etc., " lands," etc. (Laws of 1861, p. 355.) And this I think is so obviously the meaning and object of all the legislation of the State on the subject as to require only to be stated to this Court. In support of this view it may be observed that the language " every forty acre lot," etc., just quoted from section two, as amended by the Act of 1859, is a literal copy from the instructions of the Land Office at Washington to surveyors and others under the Arkansas Act. (Lester's Land Laws, 543.) Of course there will be no question as to the object of that Act of Congress— which was expressly to enable the State of Arkansas and the other new States subsequently admitted to reclaim for purposes of cultivation the swamp and overflowed lands within their borders respectively. (Brightley's Digest, p. 492, §201, etc.) It is equally clear that the object of the Acts of 1858 and 1859, as well as that of 1855, was to give effect in this State to the provisions of the Arkansas Act. (See Laws of 1858, p. 198 ; of 1859, p. 340 ; of 1855, p. 189, §18.)

The premises here being land at the bottom of the navigable waters of the sea, running out to a depth of one hundred fathoms, with a narrow selvedge along the beach between high and low water mark, averaging one hundred feet wide, and wholly incapable of reclamation for any purpose of cultivation —they were not within the scope of the Act of 1858, or the amendatory Act of 1859, and there was no authority to sell or patent them under those Acts. The only question is,

whether the authority is found in the provisions of the Act of May 14th, 1861. The language of that Act, so far as it is material to this case, is as follows:

" The sales of all marsh and tide lands belonging to this State that have been made in accordance with the provisions of any of the Acts of the Legislature providing for the sale of the swamp and overflowed lands belonging to this State, are hereby ratified and confirmed; and any of said marsh and tide lands that remain unsold may be purchased under the provisions of the laws now in force providing for the sale of the swamp and overflowed lands of this State; and all moneys derived from the sale of such lands shall be paid into the State swamp fund, to be used for the reclamation of the swamp and overflowed lands," etc.

We shall better understand the meaning of this validating Act, and indeed of the preceding Acts of 1858 and 1859, as well as that of 1855, (all of them being *in pari materia,*) if we stop to consider the different classes of lands embraced within this system of legislation.

The meaning of the words " swamp and overflowed lands," as originally used in the Arkansas Act, undoubtedly was lands inundated and converted into swamps by the rise of the fresh water streams and lakes of that State in certain seasons, entirely unaffected by the tides, which, as is well known, are not felt within the borders of that State on account of its distance from the sea and the strength of the current of the Mississippi. All such continued, of course, to be public lands of the United States after the admission of Arkansas into the Union. In this State, also, there is a large quantity of lands belonging strictly to the same class, upon the Sacramento and San Joaquin Rivers, and other watercourses above the ebb and flow of the tide. These constituted one class of lands, and the only one strictly within the scope of the Acts of 1855, or of 1858 and 1859, whether we regard their terms and manifest object, or those of the Arkansas Act, to give effect to which in this State they were passed.

Besides these, there is in this State a quantity of other lands

which are flowed in part by the ordinary high tides of each twenty-four hours, and therefore as to that part belonging to the State by virtue of her sovereignty; and as to the far greater remaining part by the spring tides at each full moon, and as to that part belonging to the United States as portion of her public lands. Such are the flats and salt marshes, so common and so extensive in this State, bordering upon the harbors, bays, rivers, and watercourses within the ebb and flow of the tide. A very large (if not the larger) portion of these lands, as is well known, is capable of being reclaimed for cultivation, and may well be denominated "marsh and tide lands." Undoubtedly they are the lands intended by the Legislature under that denomination, as distinguished from the "swamp and overflowed lands," a distinction fully recognized in the session of 1861. (See "Act to provide for the reclamation and segregation of swamp and overflowed and salt marsh and tide lands," etc., Laws of 1861, p. 355, Sec. 27.) They form another class of lands, and are for the first time distinctly specified in the legislation of 1861. As before observed, they fall strictly within the class of "swamp and overflowed lands" under the Acts of 1855, 1858, or 1859. Such lands differ in the utmost degree as to capability of reclamation from the premises in question here, being in part a narrow strip of sea beach between high and low water mark, and as to the far greater remaining part the bottom of the sea under the navigable waters of the Pacific Ocean, extending out to a depth of one hundred fathoms. It is impossible to hold that the provisions in any of these statutes as to "marsh and tide lands" could comprehend the premises, or in any way be invoked to aid the respondent.

Both by the civil and the common law the sea shore is deemed to be public property existing for the free and common use of all, and the king cannot divert it from this purpose by alienation or otherwise. (Hale de jure Maris, Part 1, Chap. V; Angel on Tide Waters, 23–25; *Commonwealth* v. *Charleston*, 1 Pick. 182; *Corfield* v. *Coryell*, 4 Wash. 379; *Pollard's Lessee* v. *Hagan*, 3 How. 230.)

Ought it to be assumed that the State of California has, in her legislation for the sale of her swamp and overflowed lands, established a system which violates this great principle of universal law, and surrendered her sea coast, except as to a few enumerated portions, to private acquisition, ownership, and control ?

The occupation by the relator and his associates of that portion of the premises between ordinary high and low water mark for mining purposes, and their actual use thereof for that purpose, gave them an equitable claim to the same as the licensees of the State. They were not mere trespassers, but favored possessors, and had a right to be protected in the possession of their selected locality.

It is well established that when a patent has been obtained by means of fraudulent or false suggestions or representations, it will be vacated. (*King v. Vernon*, 371–373; *Seward's Lessee* v. *Hicks*, 1 Harris and McH. 23–25; *Lord Proprietary* v. *Jennings*, Ib. 92, 100, 102, 144; *Carroll's Lessee* v. *Llewellin*, Ib. 165–168; Opinion of Attorney-General Daniel Dulany upon case stated, Ib. 554–556; *Smith* v. *State of Maryland*, 2 Harris and McH. 244, 252; *Norwood* v. *Attorney-General*, Ib. 201, 210; *Jackson* v. *Lawton*, 10 Johns. 23–25; *State* v. *Reed*, 4 Harris and McH. 6, 10.)

The State may sue to annul a patent for any proper cause, although it had ceased to have any right in the land, and the same had already passed into the ownership, inchoate or perfected, of third persons.

Upon the argument below, it was contended by the respondent that if the relator and the Dead Whale Asphaltum Company have any right to the possession of the premises between ordinary high and low water mark, or to work the mines under the license of the State, then the State has no interest in the controversy, and cannot maintain the action.

We understand the law to be settled that the State always has an interest to annul a patent outstanding in derogation of its own rights, or those of any of its citizens. (*Jackson* v. *Lawton*, 10 Johns. \*25.)

*J. B. Crockett,* for Respondent.

The Act of 1858 (Sec. 13) makes a distinction between ordinary *fresh water* swamp land and " *salt marsh* land," in this, to wit: that the latter were not to be subject to sale until six months after the passage of the Act, except to parties owning or occupying the adjoining arable lands. But subject to this restriction, " salt marsh" lands were certainly subject to sale. It becomes material, then, to inquire what are " salt marsh" lands? I claim them to be all lands which at certain stages of the tide, whether of the neap tides or spring tides, are covered with water, and at other stages are not covered. If they are covered by the daily high tides, and are above the water at low tide, they are as much " salt marsh" lands as if they were covered at the spring tides only. But if " salt marsh" lands are covered by the daily ordinary high tide, then they are lands which belong to the State by virtue of its sovereignty. This will not be denied. Nor can it be denied that such lands were subject to purchase under the Act of 1858. It is obvious, then, that by that Act, lands which belonged to the State by virtue of her sovereignty, could be purchased. But as a condition to the purchase, the applicant was required to make oath that he desired the lands for the purpose of settlement and cultivation. This restriction was removed by the Act of 1859, after which such lands were subject to purchase without any qualifications as to the purpose to which they were to be applied. It appears, then, that some lands, below ordinary high tide, and which belonged to the State by virtue of her sovereignty, were liable to purchase, and without any obligation on the purchaser to reclaim or cultivate them. In such case must the purchaser stop at the *beach ?* or may he not take all the land down to low tide or beyond it, if he wishes? why allow him to purchase a *part* of the land, below the usual high tide, and exclude him from other portions ? Where could the line be drawn in such a case ? If the beach shelve up gradually from low water mark and extend back for half a mile, creating a salt marsh, could not

such land be purchased down to low water mark? If not, at what point could the line be drawn?

The point I make, therefore, on this clause of the statute is, that *all* salt marsh land, whether below neap or spring tides, is subject to purchase down to low water mark; from which it is evident the Legislature did not intend to reserve the beach from sale.

But subsequent legislation indicates distinctly the policy of the State in respect to these lands. By the Act of May 13th, 1861, a Commission was organized for the reclamation and sale of swamp and overflowed, salt marsh, and *tide* lands. It does not repeal the Act of 1859, except that it modifies the affidavit to be made by the claimant, and all the above named lands are placed on the same footing, (Sec. 27.) They are all to be surveyed, segregated, and sold. By another Act passed on the next day, (14th May, 1861, Session Acts 1861, p. 363,) the sales of all marsh and *tide* lands belonging to this State, that had been made " in accordance with the provisions of any of the Acts of the Legislature providing for the sale of the swamp and overflowed lands belonging to this State," were ratified and confirmed ; and it was further provided, that all such lands remaining unsold " may be purchased under the provisions of the laws now in force providing for the sale of the swamp and overflowed lands of this State."

This Act recognizes the fact that tide lands had been sold *in accordance* with previous Acts, and ratifies such sales. But it is said that if the previous Acts authorized the sale, and if the sales had been made *in accordance* with those Acts, what need was there of a confirmatory Act? A ready answer is found in the fact that doubts existed as to the validity of such sales, and the Act was passed simply to remove these doubts. Hence, it provides that where sales had been made "*in accordance* with," that is to say, according to the forms prescribed by former Acts, the sales shall be deemed valid. It was simply a legislative interpretation of the former Acts, and in order to remove all doubt for the future, it provides that all such lands remaining unsold may be purchased under the provisions of

the laws then in force. It also changes the destination of the funds to be derived from such sales, and appropriates them to the swamp land fund. This Act indicates, unmistakably, the policy of the Legislature in respect to tide lands. It confirms all sales that had been made, and authorizes future sales.

But this Act has an important bearing on the case at bar in another respect. The first affidavit made by the respondent with a view to the purchase of the land in contest, was made on the 2d March, 1861, and was filed with the County Surveyor on the 8th March, and the first survey was made on the 14th March. An amended affidavit was made on the 20th April, 1861, and filed with the County Surveyor on the 20th May, 1861. The last named affidavit was therefore made a few days *before* the passage of the Act of the 14th May, 1861, but was filed with the Surveyor *after* the Act passed and whilst it was in force. The patent was issued October 4th, 1861. The survey was approved by the Surveyor-General, July 30th, 1861. The Act of May 14th was therefore in force when the amended affidavit was filed, when the survey was approved, and when the patent issued. On these facts I insist that the patent is valid as coming within the provisions of that Act. All the proceedings which give validity to the title occurred *after* the passage of the Act, and are governed by it. It is wholly immaterial that the affidavit was sworn to before the passage of the Act. It took effect as an affidavit from the time of its delivery to the Surveyor, and the survey founded upon it being approved *after* the passage of the Act, must be governed by it. The question to be decided is whether or not, at the date of the survey and patent, the land in contest was subject to be so conveyed. If the land was then subject to sale, it does not follow that any slight irregularity in the preliminary proceedings would vitiate the patent. When the State asks the Court to vacate its own patent, it must establish either fraud or mistake, or that the patent was issued in violation of law. I am now considering the latter ground, and think I have shown that the land was subject to purchase under the Act of May 14, 1861, when all the essential steps were taken,

to wit: when the surveyor received the affidavit, when the survey was approved, and when the patent issued, and these are all that were necessary to establish the power of the Governor to issue the patent. In the absence of fraud, so solemn an instrument as a patent for lands ought not to be disturbed on the purely technical ground that an affidavit was sworn to a few days before it was delivered to the proper officers. The State has been paid for this land, and ought not to be allowed to avoid its deed on the dryest possible technicality, which in no manner affects the intrinsic merits or justice of the respondent's title to the land.

In entering or pre-empting lands under the land system of the United States, certain forms are prescribed and certain acts to be done before and by the Register and Receiver. If a slight informality occurs in the proceedings, if an affidavit is sworn to a few days too late or too soon, or before the wrong officer, or if the surveyor in sectionizing the land has committed a small mistake, and the claimant in good faith has paid his money and received his patent, would any Court tolerate an application from the Government to vacate the patent for such reasons? If so, there would be no repose in titles. No man would be safe in buying patented lands if his title was at any time liable to be overthrown by proceedings to vacate the patent because of trifling defects of form in the preliminary steps. Every principle of public policy demands that patents shall not be disturbed for trivial causes.

My argument on this branch of the case may therefore be summed up as follows, to wit:

1st. That by the Act of 1855, tide lands were expressly excepted from sale.

2d. That by the Act of 1858, the reservation was removed, and said lands were authorized to be sold.

3d. That it was not a condition of such sale that the lands were to be reclaimed or cultivated, or that they were fit for cultivation.

4th. That the Act of May 14, 1861, is a legislative interpre-

tation of the preceding Acts, and was intended only to remove existing doubts as to the validity of such sales.

5th. That the patent is valid under the last named Act, and is protected by it.

6th. That slight irregularities, if any existed in the preliminary steps, will not vitiate the patent.

The appellants claim that even though the beach itself was subject to purchase, the land *below* low water mark was not, and that as the patent embraces lands covered with the water of the ocean at all times, the whole patent is void

Their position is that if a patent embrace some lands which were grantable and others which were not, the whole patent is void, that it cannot be good in part and bad in part, but will be set aside *in toto* if it embrace *any* lands which could not be granted. The District Court held the patent to be good for the beach, but void as to the land below low water mark.

For the purposes of this argument it is not material whether the lands below low water mark could be granted or not, provided the Court was right in the position that the whole patent is not void because it embraced some lands not subject to grant. I shall therefore first address myself to the latter proposition.

The law on this point is too well settled to admit of serious debate.

The leading case on this point in the Supreme Court of the United States is *Danforth* v. *Wear*, 9 Wheat. 673, in which the Court held the patent to be valid for a part of the land and void as to the residue. The case of *Patterson* v. *Jenks'* *Lessee*, 2 Peters, 216, is directly in point. The Court in its opinion uses this emphatic language: "In the nature of the thing we perceive no reason why the grant should not be good for land which it might lawfully pass, and void as to that part of the tract for the granting of which the office had not been opened. It is every day's practice to make grants for lands which have in fact been granted to others. It has never been suggested that the whole grant is void because a part of the

land was not grantable." The opinion was delivered by Mr. Chief Justice Marshall.

This was followed by the case of *Winn* v. *Patterson,* 9 Peters, 663, in which the opinion was delivered by Judge Story, and in which occurs the following passage. Referring to one of the instructions he says : " It contains a proposition absolutely universal in its terms, and that a grant of land is an entirety, and that a grant void in part is void for the whole. If this proposition were true, then a grant of ten thousand acres which was void for any cause as a conveyance of one acre, although it might be for want of title in the grantor, would be void in the remaining nine thousand nine hundred and ninety-nine acres."

The same principle is held in *People* v. *Mansan,* 5 Denio, 389 ; *People* v. *Livingston,* 8 Barb. 253–283 ; S. C. 6 Taunt. 369.

I invite attention also to the case of *The People* v. *Van Rensalear,* 5 Seld. 291, in which the principle is discussed at some length, and the authorities are collated on pages 323, 324. (See also, *Little* v. *Bishop,* 9 B. Monroe, 246 ; *Janet* v. *West,* 1 Har. & John, 501 ; *Hough* v. *Dumas,* 4 Dev. & Bat. 328.)

These authorities are a sufficient response to the argument of appellants' counsel on this point. They establish the principle too firmly to admit of debate that a patent is not void because it embraces some land not grantable, but is good for all the land which it properly includes.

By the Court, SHAFTER, J.

This suit was brought to set aside a patent issued by the State to the respondent on the 4th of October, 1861. The lands covered by the patent are described therein as " one hundred and sixty acres of State tide lands, situated in the County of Santa Barbara." It appears further from the record that the lands lie immediately upon the sea beach, composed of rock and sand, upon which a heavy surf runs at ordinary high tide ; and that the remaining portion of the land is cov-

ered by the waters of the ocean to a depth, at ten chains from the shore, sufficient for any class of vessels, and beyond that to a depth of from sixty to one hundred fathoms. That the average width of that portion between ordinary high and low tide is about one hundred feet, and at ten or twelve feet from ordinary high water mark, without the boundaries of the tract, there is a range of perpendicular cliffs, averaging two hundred and fifty feet in height, running along the whole length of the land, the base of which at the high tides is washed by the surf, and in which, and in and along which said last portions of land, are large and valuable deposits and beds of asphaltum. No part of the tract is fit for cultivation or capable of producing a crop or vegetable growth of any kind. It appears by one of the recitals in the patent that the land was taken up by the respondent under the Act of April 21, 1858. The prayer of the complaint is to the effect that the patent may be vacated on the ground of fraud, and on the further ground that lands of the character included in the patent have never been offered for sale by the State. We shall have occasion to discuss only the point last named.

1. The public lands of the State are distinguishable into two general classes : First, those which it holds by virtue of grants from the United States ; second, those which it owns by reason of its sovereignty. The first class includes the grant of five hundred thousand acres, September 4, 1841 ; the grant of the sixteenth and thirty-sixth sections in each township for the use of schools therein ; of seventy-two sections for the use of a seminary of learning, and of ten sections for public buildings, March 3, 1853 ; the grant of one hundred and fifty thousand acres for an agricultural college, July 2, 1862, and the grant of all the swamp and overflowed lands in the State belonging to the Government, September 28, 1850. The second class of lands, belonging to the State by reason of its sovereignty, includes the shore of the sea and of its bays and inlets, in the common law definition of the word "shore ;" that is, the land usually overflowed by the neap or ordinary tides. (*Pollard's Lessee* v. *Hagan,* 4 How. 212 ; *Goodtitle* v.

*Kibbe*, 9 How. 471 ; 13 How. 25 ; *Teschemacher* v. *Thompson*, 18 Cal. 21 ; Act of 1850 adopting the common law, Wood's Digest, 168.) In the Act of 1855 (page 189) there is a direct expression of legislative opinion as to the character of the land owned by the State by virtue of her sovereignty. The Act is entitled "An Act to provide for the sale of the swamp and overflowed lands belonging to this State," but it is provided in the eighteenth section that the Act " shall not apply to or in any manner affect any lands belonging to this State by virtue of its sovereignty, below the line of ordinary high tide water, or the sea shore and the shores of the harbors on the coast of this State." In so far as the lands held by grant are " swampy or subject to such periodical overflows as to injure or destroy the crops " (see circular of General Land Office, March 8, 1864, Wood's Digest, p. 746,) the State became the owner of them by reason of the Act of September 28, 1850, commonly known as the "Arkansas Act."

From this examination it appears that the lands included in the defendant's patent are lands that became the property of the State by reason of its sovereignty.

2. None of the lands belonging to the State by reason of her sovereignty were offered for sale by the Act of 1855, as we have already seen. This Act was repealed by the Act of April 21, 1858. (Acts 1858, p. 198.) That Act, by its title provides for the sale of " swamp and overflowed lands," but the first section not only describes the lands offered for sale as " swampy and overflowed," but indicates their character still more precisely by referring to them as lands comprehended in the grant by Congress of September 28, 1850. By section thirteen all swamp and overflowed lands, situated in certain localities named, are permanently excepted out of the operation of the Act, and in so far as the State's swamp and overflowed land may be made up of " salt marsh," a right to preempt is reserved for six months to the owners of the adjoining arable land. The result is that nothing was offered for sale by the Act of 1858, except the lands falling within the description of the Arkansas grant of 1850 ; and as the land included

in the defendant's patent is not within that description, it follows that the groundwork of defendant's purchase must be sought for and found, if at all, in subsequent legislation.

It is urged, however, on the part of the respondent, that it appears from the proviso to the first section of the Act of 1858 that the State by that Act offered for sale its lands situate below ordinary high tide. The proviso is as follows: "*Provided*, that if upon the survey of such lands any portion thereof shall be found to be lands belonging to the State by right of her sovereignty, the moneys arising therefrom shall be paid into the Treasury of the State as other State revenues." This proviso is to be read in the light of the subject matter. It is well known that that portion of the swamp lands of the State known as "salt marsh" are threaded by channels of greater or less width within the ebb and flow of the tide, which channels are of little or no use either in the way of fishing or navigation. They are but extensions of the "mud flats," and like them belong to the State by right of its sovereignty. While the principal purpose of the Act was to sell the swamp and overflowed lands, which the State held by grant, still it was considered that that purpose could be best subserved by allowing purchasers of salt marsh to include such channels, when reasonably necessary, within their surveys. To that extent and under such or kindred circumstances it is true that the lands belonging to the State by reason of her sovereignty were offered for sale by the Act of 1858. But none of these circumstances connect themselves with the lands included in the defendant's patent. The words "if any portion thereof shall be found," etc., show very clearly that the Legislature considered the proviso as but a relaxation of the general rule in favor of a case which it regarded as exceptional.

3. The Act of April, 1859, is amendatory of the Act of 1858, but we do not consider that it enlarges the scope of the offer to sell contained in that Act. It applies to "persons who wish to purchase under this Act," (the Act of 1858) to land that is "swamp or swampy for the greater part," or "that is

subject to inundation at the planting, growing or harvesting seasons, so as to endanger or destroy the crops, taking the average seasons for a reasonable number of years prior to the year 1850 as a rule of determination." If the Legislature had intended to offer all the lands for sale owned by the State by virtue of its sovereignty, it is not to be supposed that a description so labored and so inapposite would have been adopted. The lands of the defendant's patent are neither swamp or swampy, nor is there any sensible connection between them and the "seasons" named, nor between them and "crops;" and the "average" stated might very well have been spared in view of the fact that a state of "inundation" recurring with the regularity of the tides is the normal condition of those lands.

But reference is also made to the second proviso of the fourth section of the Act of 1859, and it is claimed that it appears from that proviso that the Legislature intended to offer for sale indiscriminately all the lands which the State owned by reason of its sovereignty. The proviso is as follows : " *Provided*, further, that the said claim shall not exceed six hundred and forty acres, or measure more than one half mile front, by legal subdivision, on any bay, lake, or navigable stream." The lands included in the patent have in fact no relation to any bay or lake or navigable stream, and, therefore, if they should be considered as without the Act, the just operation of the proviso would be in no manner interfered with. The swamp and overflowed lands offered for sale and claimed by grant, border to a great extent on bays, lakes or navigable streams, as matter of fact. They extend down to the line of ordinary high water, and the lands claimed by the State by right of sovereignty extend up to the same line, and the only purpose of the proviso was to limit the number of acres which the citizen could buy landward from that line, and to limit also the extent of the frontage upon it. A conveyance by the State bounding upon the sea, or upon a bay, or navigable stream, would extend to high water mark. The

proviso is then entirely reconcilable with the views which we entertain as to the real purpose of the Act.

4. The Act of May 13, 1861, (Acts of 1861, p. 355,) entitled "An Act to provide for the reclamation and segregation of swamp and overflowed land, and salt marsh and tide lands donated to this State by Act of Congress," has no bearing upon the question of the validity of the defendant's purchase, for the only purchases it provides for not only lie in the future, but are to be made after the segregation contemplated by the Act (Sections 19, 27) ; and it may be added that the record shows that defendant did not purchase with any reference to that Act, nor does the argument of counsel claim that he did.

5. The only question remaining to be considered is, whether the purchase of defendant was authorized by the Act of May 14, 1861. (Acts 1861, p. 363.) The Act ratifies a class of purchases previously made, and authorizes purchases thereafter ; but as the purchase of the defendant was not only consummated but initiated after the passage of the Act, it does not fall within the class of purchases which the Act was intended to " ratify."

The Act is entitled "An Act to provide for the sale of the marsh and tide lands of this State," and is as follows :

" The sales of all marsh and tide lands belonging to this State that have been made in accordance with the provisions of any of the Acts of the Legislature providing for the sale of the swamp and overflowed lands belonging to this State are hereby ratified and confirmed, and any of said marsh and tide lands that remain unsold may be purchased under the provisions of the laws now in force providing for the sale of the swamp and overflowed lands of this State, and all moneys derived from the sale of such lands shall be paid into the State swamp land fund, to be used for the reclamation of the swamp and overflowed lands; *provided,* no marsh or tide lands located within five miles of the City of San Francisco or of the City of Oakland, or within one mile and one half of the State Prison grounds at Point San Quentin, shall be

sold or purchased by authority of this Act; and, *provided,* further, that no sales of lands, either tide or marsh, excepting Alcalde grants, which are hereby ratified and confirmed, within five miles of said cities, or within one mile and one half of the State Prison grounds aforesaid, shall be confirmed by this Act."

For all the purposes of the present discussion we shall assume that the word "tide" is used in contradistinction to the word "marsh," and that it is applicable to all the lands which the State owns by reason of its sovereignty, lying below ordinary high water mark, unless it appears that the meaning of the word, or rather the words, "tide lands," is limited to lands of that character that are capable of reclamation.

It is to be noticed, in the first place, that the purchase moneys of the lands intended to be sold are, by the Act, to be paid into the "State swamp land fund," and are "to be used for the reclamation of the swamp and overflowed lands." The grant to this State of the swamp and overflowed lands contained a provision that the proceeds of sales should be devoted by the State, so far as should be necessary, to their reclamation; and the policy of the State, as shown by the general current of its legislation, has been to make those lands pay for their own reclamation; and so rigorously was that policy adhered to in 1858 that by the Act of that year, if any land claimed by the State by right of sovereignty "should be found to be included in a survey of swamp and overflowed lands," it was required that the moneys arising therefrom should be paid into the Treasury of the State as other State revenues. If the Legislature intended by the Act of May 14, 1861, to secure the reclamation of the public lands, except by sales of such as were themselves reclaimable, then it must be held to have abandoned a policy not only sensible in itself, but one which had become traditional also.

But, further, the Act in question requires that purchases "should be under the provisions of the laws now in force, providing for the sale of swamp and overflowed lands of this

State." The Acts then in force were the Act of 1858, as amended in 1859, and the Act of May 31, 1861. The former Act was passed for the purpose of "reclamation," as stated in the title, and all purchase moneys are required to be credited, when paid in, to the swamp land fund, to be appropriated to the work of reclamation as the Legislature shall thereafter direct. The Act of 1859 is but amendatory of the Act of 1858, and therefore in effect bears its title, and it does not vary the disposition to be made of the purchase moneys.

Though the Act of 1859 presents a form of affidavit differing in some respects from that prescribed by the Act that preceded it, yet in our judgment the Acts agree in this, that the lands to which they both relate are lands susceptible of reclamation; and as to the Act of May 13, 1861, "reclamation" is one of the objects avowed in its title, and one to which its provisions steadily refer.

From the foregoing examination it appears, then, that one of the leading "provisions" subject to which tide lands were offered for sale, under the Act of May 14, 1861, required that they should be reclaimable in their character. It is no misuse of terms to hold that the very subject matter of an enactment is within its "provisions," and it is difficult to see how the respondent could purchase a kind of land "under" the "provisions," referred to in the Act of 1861, to which lands those provisions had no just application. It is at least indisputable that the provisions under which lands are to be bought by the Act in question include all matters of procedure, nor can it be doubted that the affidavit required by the Act of 1859 is a part of the procedure. But the nature of the facts to be set forth in the affidavit fix the character of the land to which the affidavit was intended to apply, and the land to which the affidavit was intended to apply must be the land, and the only land, which the Legislature intended should be sold. It may be true, as the counsel of the respondent contends, that one of the purposes of the affidavit (and counsel insists that it was the sole purpose) was to distinguish between the lower lands and upland; but to our minds it is equally clear that the pur-

pose was to distinguish also between tide lands that were reclaimable on the one hand and those that were irreclaimable on the other. The "facts" of the affidavit are to be regarded as tests of character, and while the words "swamp" and "swampy," and the reference to "planting, growing or harvesting seasons," etc., and to "crops," very clearly exclude uplands from the offer to sell, they are in our judgment no less efficient to exclude lands of the quality covered by the respondent's patent.

7. As to the demurrer for misjoinder of parties plaintiff.

It is not denied that the State is interested in the principal purpose of the bill—the cancellation of the respondent's patent; and, as owner of the land, it could properly claim an injunction restraining the defendant from removing the asphaltum.

The asphaltum company claims an interest in the lands under the mining laws of this State; but over and beyond that, it is a party to an action of replevin that cannot be determined upon its merits so long as the respondent's patent shall be outstanding; and Pierce is interested in the cancellation of the patent for a similar reason. While it is true that there is, in strictness, no joint interest vested in the plaintiffs adverse to the respondent, still they all have a common interest in annulling the patent—and that is enough. (Story's Eq. Pl. §278*a*, 279, 279*a*; *Fellows* v. *Fellows*, 4 Cow. 682; *Owen* v. *Frink et al.* 24 Cal. 171.)

But admitting that the plaintiffs have a common interest to the intent of cancellation, it is still insisted that the people have no interest in the temporary injunction granted in the first instance, except in so far as it restrains the defendant from excavating and removing the asphaltum. That Pierce and the company having no interests in the land, nor in the asphaltum deposits, are interested in the injunction only in so far as it restrains the prosecution of the personal actions before referred to, pending this litigation. Assuming that there is a misjoinder in this aspect of the complaint, still there being no misjoinder of parties so far as the question of the validity of the patent

and the relief of cancellation is concerned, the demurrer should be overruled on the ground that it is too general. If a demurrer is too general, that is, if it covers, or is applied to the whole bill, when it is good as to part only it will be overruled; for a demurrer cannot be good as to a part which it covers and bad as to the rest, and therefore it must stand or fall together. But again, the objection of multifariousness, comprehending to some extent the case of misjoinder of parties and causes, is in many cases a matter of discretion, and no general rule can be laid down on the subject. (Story's Eq. Pl. §284a, 533.) As matter of discretion, we consider that in this case there is no misjoinder of parties or of causes of actions. The parties are all interested in the principal question raised by the complaint; the issues tendered are simple and foreshadow no embarrassment to a convenient and orderly trial; and by the joinder objected to a multiplicity of suits has been avoided. We add further, that no question upon the demurrer is properly before us, but as the parties have argued it we have concluded to give our opinion upon it.

The order dissolving the injunction is reversed.

Mr. Justice Sawyer expressed no opinion.