## The City of Peoria

*v.*

## The Central National Bank.

*Opinion filed October 23, 1906—Rehearing denied Dec. 13, 1906.*

1. Riparian rights—*meander line is not intended as a boundary.* A meander line run by a surveyor along the bank of a river to ascertain the amount of land in a fractional section is not intended as a boundary line, but the water-course is the boundary.

2. Same—*riparian proprietor takes to center thread of stream.* A grant of land bordering upon a river or stream, whether navigable or not, carries title to the center thread of the stream unless the boundary is in some way otherwise designated.

3. Same—*lines dividing river frontage do not run from meander line.* In dividing water rights or accretions among riparian proprietors, the lines to the thread of the stream are not to be drawn from the meander line but from the "shore" line, which, in its usual meaning, as applied to inland streams, means the water's edge at low water.

4. Same—*rule as to dividing accretions.* In dividing accretions the lines should not be drawn at right angles to the thread of the stream or the shore line, unless the general course of the river and of the bank are parallel both as to the old and new shore line, but the lines should be so drawn as to give each proprietor a frontage upon the new shore proportionate to that which he had on the old shore, without regard to the side lines of the upland.

5. Records—*it is presumed that plat was copied correctly in the records.* Since the presumption always is that public authorities do their duty, it will be presumed, until the contrary is shown, that a plat was correctly copied in the public records.

6. Same—*what does not justify writing word "street" in record.* A recorder of deeds is not justified in writing the word "street" upon the record of a plat made by another person over fifty years before, even though the word appears upon the original plat, which contains writing seeming to be in various hands, and which might have been tampered with by some one outside of the recorder's office before his time.

7. Municipal corporations—*when a municipal corporation is estopped to claim land.* A municipal corporation is estopped to claim as a public street, land which for sixty years has been occupied by private parties with substantial buildings, including mills and docks, and upon a portion of which such parties have paid taxes for all the years since the patents to the land were granted.

APPEAL from the Circuit Court of Peoria county; the Hon. L. D. PUTERBAUGH, Judge, presiding.

The appellee, the Central National Bank, filed its bill in the circuit court of Peoria county at the September term, 1902, representing that it was then the owner in fee and in possession of certain premises therein described, in Peoria, fronting on that part of the Illinois river called Peoria Lake, under a chain of title running to the United States, as well as by payment of taxes, possession and improvement for much longer than the statutory period; that the appellant, city of Peoria, claimed said premises as a street or public property, having torn down a fence enclosing them, erected by a prospective purchaser, and announced its intention of tearing down any fence that might be built; that thereby the sale was broken up and title of the appellee clouded and the chances for future sales interfered with. Prayed that the city might be enjoined from claiming title or removing improvements. Appellant answered the bill denying the title in appellee and asserting it in itself. The case was referred to a master in chancery, who reported that there was no equity in the bill and recommended that it be dismissed. Appellee objected to the master's report, and the court sustained the objections and entered a decree in favor of appellee, confirming the title to the premises in question in said appellee and perpetually enjoining the city from interfering with the possession or with the construction of proper buildings or improvements on said land. From that decree the defendant in the trial court appealed, assigning errors substantially covering the major portion of the findings of said decree.

The plat given herewith shows approximately the situation, surroundings and the premises in question, and is substantially the same as appellant's "Exhibit A:"

PLAT I.

The line G A is the section line between fractional sections 9 and 10. The line A B is what is claimed by the appellee to be a part of the section line dividing sections 9 and 10, and by appellant to be an extension of said section line. E F is the meander line as run by the government survey, A being the point where the section line and meander line intersect. B D represents the present dock line along the river. C A represents a line drawn perpendicularly to the thread of the stream from the point where the section line and the meander line intersect. The land in question is the triangle A B C.

The city contends that the meander line represents the location of the bank of the river at the time fractional section 10 was platted and marks the south-westerly limit of the land embraced in the patent to Mills; that the land be-

tween line E F and line B D, or at least that part included in the triangle A B C, has been formed by accretion or filling in since that time, and its ownership should be determined according to the law of accretions; that the point A represents the dividing line at the river between the lands of the original proprietors, and that the dividing line between the owners across such added land down to the present river front should not be a continuation or extension of the section line, but should run perpendicular to the thread of the stream from the point A. Appellee contends that the said dividing line should be the section line, which actually extends to the present water front; that the meander line did not represent the margin of the river at the time the land was patented; that the patent to fractional section 10 embraces the land in dispute; that the title to the same rests in appellee under a chain of deeds from the original patentee; that the said appellee also claims said land under long continued adverse possession, payment of taxes and improvements; that said city is estopped from laying claim to the land in question by certain of its acts. A copy of part of defendant's "Exhibit I," showing the government survey of said fractional sections 9 and 10 with their front on the Illinois river and Peoria Lake, is herewith given for better understanding of the discussion of the facts in the case:

PLAT 2.

Defendant's "Exhibit H," which in the record is called "Mills' second addition," is herewith given, except certificates.   This is substantially like complainant's "Exhibit 2:"

PLAT 3.

The following notation was made on plat 3 by the recorder of deeds in June, 1902, as to the writing in of the word "street:"

"Note—The word "street" written on the west end of above plat by me to conform with the original plat still remaining on file in this office.

"Dated this 20th day of June, A. D. 1902.

JOHN JOHNSTON, *Recorder of Deeds."*

W. H. MOORE, City Attorney, (HENRY MANSFIELD, of counsel,) for appellant:

The rule in the State of Illinois is, that the boundary of lands bordering on a non-navigable stream extends to the middle thread of the river. *Middleton* v. *Pritchard,* 3 Scam. 570; *Houck* v. *Yates,* 82 Ill. 179; *Improvement Co.* v. *Niedringhaus,* 181 id. 435; *Railway Co.* v. *Brewing Co.* 174 id. 547; *Ballance* v. *Peoria,* 180 id. 29.

Side lines of riparian proprietors whose lands front on a non-navigable river extend from their termini on the shore at right angles with the thread of the stream, unless they are otherwise fixed by the deed under which title is derived. 4 Am. & Eng. Ency. of Law, 832; *Wood* v. *Appal,* 63 Pa. St. 210; *Knight* v. *Wilder,* 2 Cush. 207; *Clark* v. *Campau,* 19 Mich. 325; *McCullough* v. *Wall,* 4 Rich. 68; *Miller* v. *Hepburn,* 8 Bush. 330; *Heirs of DeLord* v. *New Orleans,* 11 La. Ann. 699; *Kehr* v. *Snyder,* 114 Ill. 313; *Elgin* v. *Beckwith,* 119 id. 376; *Griffin* v. *Johnson,* 161 id. 378.

Where lots are sold by reference to a plat, the proprietor of the land so selling thereby dedicated to public use the streets as shown upon such plat. *Godfrey* v. *Alton,* 12 Ill. 29; *Lake View* v. *LeBahn,* 120 id. 92; *Earll* v. *Chicago,* 136 id. 277; *Gosselin* v. *Chicago,* 103 id. 625.

The Statute of Limitations does not run against a municipal corporation in respect to property held by it for public use. *Piatt County* v. *Goodell,* 97 Ill. 304; *Lee* v. *Mound Station,* 118 id. 304; *Greenwood* v. *LaSalle,* 137 id. 225.

It is not within the lawful authority of the governing body of a city to abandon the streets which they hold for the use of the public. *Lewiston* v. *Proctor,* 27 Ill. 414; Elliott on Roads and Bridges, sec. 972; *Harvey* v. *Haverstraw,* 124 N. Y. 275; *Shirk* v. *Chicago,* 195 Ill. 298; *DeKalb* v. *Luney,* 193 id. 185.

A city is not estopped to claim land as part of a street because it commenced condemnation proceedings which were never consummated, nor by reports of committees of the city council, nor by the fact that the land was taxed for city and county purposes. *Chicago* v. *Sawyer,* 166 Ill. 290; *Chicago* v. *Wright,* 69 id. 318; *Lemon* v. *Hayden,* 13 Wis. 159; *Wyman* v. *State,* 13 id. 663.

The mayor of the city or its officers have no authority to grant individual rights or easements in the streets which might in any way interfere with the duty of preparing them for public use. *Quincy* v. *Jones,* 76 Ill. 231; *Canal Co.* v. *Garrity,* 115 id. 155; *Ligare* v. *Chicago,* 139 id. 46; *Alton* v. *Transportation Co.* 12 id. 38; *Lee* v. *Mound Station,* 118 id. 312; *Chicago* v. *McGuire,* 51 id. 256; *Smith* v. *McDowell,* 148 id. 51; *Stack* v. *East St. Louis,* 85 id. 377.

Something more than mere possession of a street by private parties must be shown in order to create an equitable estoppel against a city or the public. *Sullivan* v. *Tichenor,* 179 Ill. 97; *DeKalb* v. *Luney,* 193 id. 185; *Railway Co.* v. *Joliet,* 79 id. 25; *Railway Co.* v. *People,* 91 id. 251; *Shirk* v. *Chicago,* 195 id. 298.

To create an equitable estoppel against a city it must appear that structures have been erected on the street of such character that to permit the public to re-possess itself of the premises would entail such loss upon the property holder that justice would demand that the public be estopped. *DeKalb* v. *Luney,* 193 Ill. 185; *Sullivan* v. *Tichenor,* 179 id. 97; *Railway Co.* v. *Joliet,* 79 id. 25; *Railway Co.* v. *People,* 91 id. 251; *Piatt County* v. *Goodell,* 97 id. 84; *Lee* v. *Mound Station,* 118 id. 304; *Shirk* v. *Chicago,* 195 id. 298.

224—4

JACK, IRWIN, JACK & DANFORTH, for appellee:

·In a fractional section or township laid out by government surveyors the boundary lines are required to be ascertained by running from the established corners due north and south or east and west to the water-course, Indian boundary line or other external boundary of such fractional township or section. *Railroad Co.* v. *Schurmeier,* 74 U. S. 272; *McCormick* v. *Huse,* 78 Ill. 363; *Schurmeier* v. *Railroad Co.* 10 Minn. 59; *Brown's Lessee* v. *Clements,* 3 How. 650; *Hagen* v. *Campbell,* 8 Port. 9.

A meander corner or meander line is not a boundary. *Houck* v. *Yates,* 82 Ill. 179; *Middleton* v. *Pritchard,* 3 Scam. 510; *Fuller* v. *Dauphin,* 124 Ill. 542; *Bridge Co.* v. *People,* 197 id. 199; *Fuller* v. *Shedd,* 161 id. 462.

The rule is universal that a description of land as running to a stream, and thence along the stream, extends it to the middle or thread of the stream. 3 Washburn on Real Property, 436; *State* v. *Gilmanton,* 9 N. H. 461; *Hatch* v. *Dwight,* 17 Mass. 280.

Possession of part of a tract of land under color of title to the whole tract is possession of the whole tract described in the deed. *Improvement Co.* v. *Niedringhaus,* 181 Ill. 426; *Dills* v. *Hubbard,* 21 id. 328; *Saulet* v. *Shephard,* 71 U. S. 502; *Benne* v. *Miller,* 50 S. W. Rep. 824; *Ewing* v. *Burnett,* 11 Pet. 53; *Zirngibl* v. *Dock Co.* 157 Ill. 430.

Appellant is equitably estopped by recognition of appellee's title and collection of taxes thereon for over fifty years. *Railroad Co.* v. *Joliet,* 79 Ill. 25; *Peoria* v. *Johnston,* 56 id. 51.

The doctrine of estoppel *in pais* becomes applicable through the acquiescence of appellant in appellee's possession. *Ballance* v. *Peoria,* 180 Ill. 29; *Railway Co.* v. *People,* 91 id. 254; *Railroad Co.* v. *Joliet,* 79 id. 25; *Martel* v. *East St. Louis,* 94 id. 67; *Roby* v. *Chicago,* 64 id. 447; *Logan County* v. *Lincoln,* 81 id. 156.

Mr. JUSTICE CARTER delivered the opinion of the court:

March 18, 1837, the United States government gave a patent to fractional section 10, north-west of the Illinois river and now in the city of Peoria, to Benjamin Mills, as assignee of John L. Bogardus. In 1834 the fractional north-east quarter of section 9 was patented to the county commissioners of Peoria county, upon which quarter section the town of Peoria was laid out and platted. The government survey of fractional sections 9 and 10 was made in 1817. The chief controversy in this record concerns the location of the point which marks the southerly end of the section line between said fractional sections 9 and 10, counsel for appellant contending that the section line ends at the meander line running along the bank of the Illinois river, while counsel for appellee insist that it continues to the center thread of the Illinois river, or at least to the water line.

The rule is settled that meander lines are not intended as boundaries, but that the body of water will be regarded as the true boundary. (Farnham on Water and Water Rights, sec. 418.) According to the decisions in most of the States in which lands were surveyed under United States laws, the lines run by the surveyors along the river banks are not lines of boundary, the owners of the adjacent lands taking at least to the water's edge, thus giving them the benefit of river frontage, with the right of access to the river and the incidents of riparian proprietorship as to the use of the water. (Gould on Waters,—3d ed.—sec. 76.) The meander line, which is run for the purpose of ascertaining the amount of land in a fractional section, cannot be regarded as a boundary line. (*Houck* v. *Yates*, 82 Ill. 179). Where a stream was meandered in the original survey and conveyance made and price paid for the quantity within the meandered lines, the grant conveyed to the thread of the stream and the boundaries of the lands were not determined by the meander line. (*Fuller* v. *Shedd*, 161 Ill. 462.) It has also been held in this State that the riparian proprietor

in a grant bounded on the margin of a river or stream, whether navigable or not, took to the center thread of the stream. (*Middleton* v. *Pritchard,* 3 Scam. 510; *Trustees* v. *Haven,* 5 Gilm. 548; *Fuller* v. *Shedd, supra; Albany Railroad Bridge Co.* v. *People,* 197 Ill. 199.) "Meander lines are run in surveying fractional portions of public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of a stream and as the means of ascertaining the quan-tity of the land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes the meander line is represented as the border line of the stream, and shows to a demonstration that the water-course, and not the meander line as actually run on the land, is the boundary." (*Railroad Co.* v. *Schur-meir,* 74 U. S. (7 Wall.) 272.) From a copy of the official plat, which is shown as defendant's "Exhibit I" (see plat 2) in this case, it also appears here, "to a demonstration, that the water-course, and not the meander line as actually run on the land, is the boundary."

Counsel for appellant admit this to be the correct rule in this State, but insist that the meander line should be taken as the starting point or shore line from which to draw lines to the center thread of the river to show the water rights between the various property owners fronting on the river and for the purpose of dividing accretions, if any, among the property owners. No decision has been called to the attention of the court where such ruling has been made. In *Menasha Wooden Ware Co.* v. *Lawson,* 70 Wis. 600, and in *Clark* v. *Campau,* 19 Mich. 325, the opposite was held. This court in *Kehr* v. *Snyder,* 114 Ill. 313, said (p. 316): "The rule as stated in appellant's third proposition * * * we regard as substantially correct,—that is to say, 'measure the entire river front of survey 759 as it existed in 1860, when the third subdivision of Cahokia commons was first laid out,' and note the aggregate number of feet frontage, as

well as that of each parcel or lot; then measure a line drawn as near as may be with the middle thread of so much of the stream as lies opposite the shore line so measured. Having done this, divide the thread line thus measured into as many equal parts as there are lineal feet in the shore line, giving to each proprietor as many of these parts as his property measures feet on the shore line; then complete the division by drawing lines between the points, designating the lot or parcel belonging to each proprietor both upon the shore and river line." This rule was approved by the Appellate Court of this State in *Griffin* v. *Kirk,* 47 Ill. App. 258, and *Nauman* v. *Burch,* 91 id. 48, and by this court in *Griffin* v. *Johnson,* 161 Ill. 377. It is said in all of these cases that the line should be projected from the shore or shore line. The words "shore line" were also used in the same sense in *City of Elgin* v. *Beckwith,* 119 Ill. 367.

What is meant by "shore" or "shore line?" The banks of land bordering on tide water,—the space between high and low-water mark which is covered by the flow and re-flow of the tide,—are known as the shore. "The banks of land bordering on tide water are those portions of the land beginning at high tide and rising to the point where the characteristic formation of the basin holding the water ceases. The space between high and low-water mark which is covered by the flow and re-flow of the tide is known as 'shore.'" (Farnham on Water and Water Rights, sec. 143.) Gould on Waters (sec. 45) says: "A fresh water river, like a tidal river, is composed of the bed and the water; but it has banks instead of shores." The shore and bank signify the earth rising on each side of the water. "The bank and the water are correlative. You cannot own one without touching the other." (*Starr* v. *Child,* 20 Wend. 149; Angell on Water-courses,—7th ed.—sec. 26.) In *Menasha Wooden Ware Co.* v. *Lawson, supra,* the Supreme Court of Wisconsin used the word "bank" or "shore" as meaning the same thing. So, also, does the American and

English Encyclopedia of Law. (Vol. 4, 2d ed. p. 830.) The United States Supreme Court, in *Howard* v. *Ingersoll,* 54 U. S. (13 How.) 381, states (p. 415) : "When the banks of rivers were spoken· of, those boundaries were meant which contain their waters at their highest flow, and in that condition they make what is called the 'bed', of the river. The rivers have banks, shores, water and a bed, and the outer line on the bed of a river, on either side of it, may be distinguished upon every stage of its waters, high or low; at its highest or lowest current. It neither takes in over- flowed land beyond the bank nor includes swamps or low grounds liable to be overflowed but reclaimable for mead- ows or agriculture, or which, being too low for reclamation, though not always covered with water, may be used for cat- tle to range upon, as natural or uninclosed pasture." Again it is said (ibid. p. 418) : "From the lower edge of the bank the bed of the river commences." This court in *People ex rel.* v. *Board of Supervisors,* 125 Ill. 9, quoted with approval (p. 26) from *Howard* v. *Ingersoll, supra,* the following : "The bank or the slope from the bluff, or perpendicular of the bank, may not be reached by water for two-thirds of the year; still the water line impressed upon the bank above the slope is the line required by the commissioners, and the *shore* of the river, though left dry for any time and but occasion- ally covered by water in any stage of it, to the bank, was re- tained by Georgia as the river up to that line." Here the words "shore" and "bank" were not used synonymously, but with distinct meanings. The United States Supreme Court in *Alabama* v. *Georgia,* 64 U. S. (23 How.) 505, says (p. 515) : "The bed of the river is that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordi- nary freshets of the winter or spring or the extreme droughts of the summer or autumn." The Century Dictionary de-

fines "shore" to mean, "in law, the space between ordinary or high-water mark and low-water mark." The same authority defines "bank" as "any steep acclivity; as one rising from a river, a lake or the sea."

The old distinction between "shore" and "bank" as found in tide waters has not been preserved when these words have been applied to fresh water, and very frequently there has been no attempt to distinguish or define the terms. They have often been used interchangeably, yet in the majority of cases under such circumstances that the meaning has been plain. Neither the word "bank" nor "shore" has been used when it meant the top of a steep acclivity fifty or sixty feet above the ordinary water line in a fresh water river and when the subject under discussion was the division of accretions beginning at the bank or shore, yet no one doubts that the word "bank" could be properly used as applying to such a steep acclivity along the river; and even the word "shore" would not be misleading if in the proper connection it was used to mean the same acclivity. No one, however, would think of using the word "shore" or "shore line" in describing such a steep acclivity if he intended to use those terms in the sense that this court used them in *Kehr* v. *Snyder, supra,* and other decisions, in deciding on the dividing line between accretions. In those cases where the doctrine of accretions was under discussion the words "shore" and "shore line" necessarily mean the margin of the river or water's edge.

What is understood by the terms "water's edge," "margin of the river" and "shore line?" Is it the water at its highest, medium or lowest stage? What is the meaning of the terms "high-water mark," "low-water mark?" The courts have attempted to define high-water mark as the point below which the presence and action of the waters is so common, usual and long continued in ordinary years as to mark upon the soil a character distinct from that of the banks with respect to vegetation as well as soil, stating that ordinary low

water or low water was the point at which the water receded at its lowest stage. These are more satisfactory definitions than those which leave a strip of land between the riparian owners and the water. "All the advantages of riparian ownership depend upon access to the water, and the boundary of the riparian owner should be fixed at the point which will preserve such access under all circumstances, and therefore his title should follow the receding water to the farthest point of its withdrawal." (Farnham on Water and Water Rights, sec. 417; *Plumb* v. *McGannon,* 32 Q. B. Can. 8.) The whole doctrine of accretions rests upon the right of access to the water, and it must be convenient access. The right to preserve his contact with the water is one of the most valuable of a riparian owner. In all cases where practicable every proprietor is entitled to a frontage of the same width on the new line as on the old shore. (Gould on Waters,—3d ed.—sec. 162; Farnham on Water and Water Rights, sec. 67.) This court has held that the line at which the water usually stands when free from disturbing causes is the boundary of land in a conveyance calling for Lake Michigan as a line. (*Seaman* v. *Smith,* 24 Ill. 521.) Riparian owners upon navigable fresh water lakes may construct in the shore waters in front of their lands, wharves, piers, landings and booms in aid of and not obstructing navigation. (Gould on Waters,—3d ed.—sec. 179; *Revell* v. *People,* 177 Ill. 468; *Gordon* v. *Winston,* 181 id. 338.) In discussing wharf rights in *Ensminger* v. *People,* 47 Ill. 384, this court said (p. 391): "The riparian owner having the right to the exclusive use of the banks to the low-water mark, the person navigating the river cannot land against the will of the riparian owner, and becomes a trespasser if he does so without his consent."

The terms "shore" and "shore line" necessarily could not mean the meander line, as the meander is frequently run on the top of the bank,—often many feet above the usual water line reached by the river during ordinary seasons.

The term "shore line" has usually been used to mean, in natural fresh water rivers, low-water mark, and grants bounded by the shore extend to that line, making the water's edge at low water the boundary. (*Child* v. *Starr*, 4 Hill, 369.) "A boundary on or along the bank or shore of a stream, instead of on or along the stream, is generally held to restrict the title to the water's edge at low-water mark." (Jones on Real Property, sec. 488.) In *Freeman* v. *Belle-garde*, 108 Cal. 179, it was held that a grant bounded by the shore of a river when the grantor is the owner of the river conveys the land up to the lowest point of the shore at any time, in order that the grantee may at all times have access to the stream by which the land is bounded. A brief statement of the whole subject matter here involved is given by the author in Gould on Waters, (3d ed. sec. 41, note 2,) who says : " 'Shore' is strictly applicable only to the space between ordinary high and low-water mark in a tidal river, but it is sometimes used with reference to a fresh river or lake, either as synonymous with bank, or as denoting that portion of the bank which touches the margin of the stream at low water." (*Dutton* v. *Strong*, 1 Black, 23 ; *Stone* v. *Augusta*, 46 Me. 127; *Lacy* v. *Green*, 84 Pa. St. 514.) The shore line of the river must mean the water's edge, so that the riparian owner can have access at all times to the water. As Chief Justice Marshall said in *Handly's Lessee* v. *Anthony*, 5 Wheat. 376 : "The shores of a river border on the water's edge." This is in entire accord with the spirit of all discussions as to the proper division of accretions, for the only general rule deducible from those discussions is, that when a division is to be made in which several riparian owners are interested such division must be on equitable principles, so that each owner may secure a water frontage proportionate to the water line formerly owned by him. (*Smith* v. *Johnson*, 71 Fed. Rep. 647.) The general doctrine laid down by the courts of this State as to the division of accretions is, not that they should be divided at right angles with the cen-

ter thread of the stream or with the shore line, but in accordance with equity and right as shown by the special facts of each case. When the general course of the river and of the bank are parallel, both as to the old and the new shore line, then the dividing lines may be drawn at right angles to the center thread of the stream. The division in all cases must be so made that each proprietor will have a frontage on the new shore proportionate to that which he had on the old shore, without regard to the side lines of the upland. Gould on Waters, (3d ed.) secs. 162, 163; *Kehr* v. *Snyder, supra; Griffin* v. *Johnson, supra.*

Where, then, was the shore line or margin of the Illinois river,—the low-water mark,—as shown by the evidence, at the time the land was sold by the government? Nothing can be found in the testimony to justify a claim that the shore line or edge of the river was, during average seasons of the year, at the southerly edge of Water street, opposite the Truesdale mill, or for several blocks down the river. When the original town of Peoria was ordered to be laid out by the county commissioner's court, in 1825, it was provided that Water street should be one hundred and ten feet wide, commencing on the edge or break of the bank and running back one hundred and ten feet, Water street to be run parallel with the bank of the lake, so that blocks fronting the same should be the same distance from the break of the bank, that is, one hundred and ten feet. All streets except Water street were to be one hundred feet wide and extend to low-water mark, "where the fraction on which the town is situated will admit." "From the edge of the bank to low-water mark shall be considered as town property and be disposed of as water lots." Clearly at that time there was land between Water street and the river not covered by water during a large part of the year, for it is said a little further along in the same record, that "a sufficient space shall be reserved on the water lots for a market place." It may be noted in passing that all streets except Water street

were to "extend to low-water mark." It may well be urged
that the public authorities at that time considered low-water
mark the shore line or margin of the river. In the owner's
certificate attached to the plat of Mills' addition to Peoria,
platting part of section 10 immediately east of the section
line and adjacent to the premises in question, it is stated:
"All streets are eighty feet in width and the ground between
Water street and the lake is reserved." This plat shows
clearly that the shore line immediately adjacent to the prem-
ises in question jutted out into the river. The surveyor's
certificate in defendant's "Exhibit F," which is a copy of a
plat surveyed in 1832, stated that there was a bar of sand
and pebbles immediately adjacent to the premises in ques-
tion which was covered in time of high water. The plat of
the second addition to Peoria, called "Mills' second addi-
·tion" in this record, (see plat 3,) shows that lots of sub-
stantial size were platted between Water street and the
shore. The depth of the lots is not given on the plat, but if
that plat is drawn in anything like proper proportion, the
average lot being shown as fifty feet in width, then the depth
of the lots as platted must have been at least one hundred
and fifty feet.

Many witnesses testified as to the shore line and banks
in the vicinity of this property since it was sold by the gov-
ernment. Some of them were familiar with the premises
from the time the town of Peoria was laid out. The memory
of some was not very clear on details, but they agreed very
generally that ordinary water or low water was a substantial
distance from the lower side of Water street, below the
Truesdale mill, located then and now on a part of the dis-
puted premises, built in 1847 or 1848. Moses Dusenberry
testified that the planing mill was built on the same spot by
Ham, Sweeney & Littleton in 1844, and that the Aiken mill
stood a little below this. John H. Hall testified that the
shingle mill addition to the Aiken mill was located about
one hundred feet below the Truesdale mill further south,—

about the location of the dry house of the Truesdale mill. The Rock Island railroad was built in Peoria in 1854, and according to this record its depot was first erected between Water street and the river, immediately below the property in question. One of appellant's witnesses says it was on a part of the premises in question. McClure's warehouse, built in the fifties, was down the river from the Rock Island depot and between Water street and the river, the front of it, according to John D. McClure, being about one hundred and thirty feet from the lower side of Water street. Richard M. Blair said that the distance between the lower side of Water street and the river immediately opposite the premises was not less than two hundred and fifty feet, as measured on the bar extending out into the river at that point, three hundred feet or four hundred feet from Water street. Albert Truesdale, whose father bought the property on which the Truesdale mill was located, in 1852, thought that the sand bar extended into the river from the present dock line seventy-five feet to one hundred feet. Moses Dusenberry, living in Peoria seventy-two years, thought the back of the Truesdale mill at ordinary stages of water was not over fifty feet to sixty feet from the water. John H. Hall thought that from low-water mark to the high part of the bank in the neighborhood of the premises in question was three hundred feet. Henry C. Slough thought the upper side of Water street to medium-water mark was about one hundred and fifty feet, low-water mark thirty to forty feet further, that from the back of the Truesdale mill to ordinary water forty to fifty feet. Jacob Koch thought from the top of the slope of the bank to low water was from one hundred and seventy-five feet to two hundred and fifty feet. Samuel R. White thought the distance was from one hundred and fifty-five feet to one hundred and seventy feet from Water street to the river, stating that it was about like it was now. John F. King thought it was eighty feet to ninety feet from the break in the bank to the water, but the tongue

or bar ran further out.   Several of the witnesses testified that the land had been filled in between Water street and the river immediately adjacent to the premises in question, and all the witnesses agreed that the filling had been done below Water street, but many of them claimed that it was merely the raising of the land between the shore line and Water street and not the filling in of the river proper. White testified that the line of the dock, which was put in in 1886 and on which he worked, was all put in above low-water mark and that there was no made land on the land side of the dock.   Every witness who testified as to the building of the dock agreed with this statement of White's. White also testified that low-water mark when he first knew it, in the fifties, was about like it is now.

A careful examination of this record leads irresistibly to the conclusion that at the time fractional sections 9 and 10 in question were sold by the government there was a strip of land from one hundred and fifty feet to two hundred and seventy feet between Water street and the shore line all the way from the premises in question down to the river for three or four blocks, and that the widest place in all this distance was immediately adjacent to the Truesdale premises; that, as stated by the master in his report, the volume of the water in the river varied greatly at different times.   In times of very high water the river would go beyond its banks. One of the witnesses testified that water on one occasion covered all of Water street at a point down the river from the premises in question.   The banks adjacent to this property were higher than they were further down the river. When the premises in question were sold by the government there was a natural ravine extending back several blocks from the river and running into the river north-east of the Truesdale mill across lot 1 in Mills' second addition.   When Water street was first laid out, teams could not drive across this ravine on the street, but the street was shortly after filled so that it could be traveled and the ravine back of the street

partially filled up. The water still coming down the ravine was taken care of by a wooden sluice and afterwards by a sewer under the street.

There is considerable testimony as to a gully, sometimes called a "ravine," which extended across a part of the premises in question immediately below the Truesdale mill from the foot of Fayette street and ran to the river at about right angles. We are convinced from a study of the record that when the land was in its natural state and patented by the government there was no ravine or gully at that point. Dusenberry, one of the witnesses for appellant, remembered nothing about the ravine in that vicinity in the very early days, and said he only knew of one ravine, and that one emptied above the Truesdale mill. The gully below the mill was evidently caused by the surface water being turned from its natural course on account of improvements,— houses and streets,—immediately adjacent, and especially by a culvert built for surface water about the time the Rock Island road was constructed into Peoria, in 1854. The filling of the gully, according to Blair's testimony, was commenced in 1872, but it was not fully completed until after the dock was built, in 1886. On the government survey in 1883, shown as plaintiff's "Exhibit A F," there is nothing to indicate any ravine or gully at this point at that date, so that it must have then been practically filled. We conclude also from the record, especially considering this survey in connection with the other plats in evidence, that the shore line immediately adjacent to the property in question is substantially the same now as it was when the land was sold by the government, in the thirties; that the point of land shown on this government survey, as well as on the plat of Mills' first addition to Peoria, was caused by water flowing out from the ravine above the Truesdale mill, carrying dirt and debris, and was in existence long before the town of Peoria was platted. Having in mind the proof that the building of Copperas creek dam, in 1872, by the United

States government, raised the water on an average of two and one-half or three feet, the weight of the evidence in this record tends strongly to show that the shore line of the Illinois river adjacent to the premises in question when they were sold by the United States government was at least as far from Water street as the present dock line.

In 1886 the Illinois and Michigan canal commissioners, in conjunction with the city authorities of Peoria, decided to improve the water front immediately below the premises in controversy, and requested the Truesdales, then owners of the mill property, to construct at the same time a dock in front of their property, including the premises in dispute, and to dredge out the sand bar in front. During a conference concerning this matter it was proposed to trade the point on the premises in question west of the west line of Fayette street extended to the shore line, to the city in exchange for the triangle of land bounded by Water street, the west line of Fayette street extended and the section line between fractional sections 9 and 10. It appears to have been found on investigation that the city could not give good title to this triangle, but the city and canal commissioners, jointly, built the dock in front of that part of the premises in question south-west of the west line of said Fayette street extended, and the Truesdales built the dock from the west side of Fayette street extended up the river along the river front of the rest of their property. The dock built by the Truesdales was some four feet higher than the city dock. There is testimony tending to show that where the section line between said fractional sections 9 and 10 intersected the dock line, a pile seven or eight feet higher than the dock was fastened to it for the purpose of showing the dividing line between the city property and the Truesdale property. The evidence in this record shows, without contradiction, that up to the time this dock was built there had been no dispute as to the ownership of the premises in question; that so far as those premises had been occupied, used and con-

trolled they had been occupied, controlled and used by the Truesdales and those from whom they purchased; that the city had made no claim for any part of the premises theretofore. The first time any question was raised as to the ownership of this property was in 1902. We do not consider the question as to the wording of the deeds and tax receipts describing the premises in question as very material, but so far as those descriptions have any force they uphold the contention of the appellee herein. We conclude, therefore, that when the government gave a patent of said fractional section 10, in 1837, to said Benjamin Mills, it included in its sale all of the premises in question; that the doctrine of the division of accretions does not enter into the decision of this question, as the original shore line at the time the land was patented was as far out as the present dock line.

Counsel for the appellant contend that even though this be the true construction of the original grant, the premises were dedicated to the city as a part of the street when the second addition to Peoria,—called in this record "Mills' second addition,"—was platted, in August, 1836. When the plat was recorded it did not show on the records anything to indicate that the property in question was dedicated as a street. Mills, the owner of the property in question at the time the plat was made, did not sign the certificate dedicating the streets to the public. It is contended, however, that in conveying this property he afterwards referred to the plat as giving the proper description, and therefore he adopted the plat as his own act and dedicated the disputed premises, marked as a street on the plat, as a street for public use, in accordance with the rule laid down in *Godfrey* v. *City of Alton,* 12 Ill. 29, and *Russell* v. *City of Lincoln,* 200 id. 511. If the evidence showed that he transferred this property knowing that it was a part of a street then these authorities would apply, but it is hardly to be presumed that he knew about it. He did not sign the plat, and the records, after it was recorded, did not show that it was so dedicated.

There is nothing in the evidence to indicate that he knew anything about such dedication.   The surveyor's certificate attached to the plat stated that all streets should be eighty feet wide.   If this property south-west of lot 1 was all a street then the width of that street would be entirely contradictory of this statement.   The plat was recorded on August 15, 1836.   The presumption always is that public authorities do their duty, and it is therefore to be presumed, until the contrary is shown, that the public official who recorded this plat copied it correctly.   (*Niantic Bank* v. *Dennis,* 37 Ill. 381;   *Cook* v. *City of Chicago,* 57 id. 268;   *Spring* v. *Kane,* 86 id. 580.)   It appears that the original plat was found in the recorder's office about 1902,—some sixty-six years after it was recorded,—and it is evident that then for for the first time the city officials claimed an interest in the disputed premises.   The recorder of deeds at that date, John Johnston, finding this plat in his office and on comparison finding that it did not agree with the record, then wrote the word "street" on the record with the following note in the margin:   "The word 'street' written on the west end of above plat by me to conform with the original plat, still remaining on file in this office.   Dated this 20th day of June, A. D. 1902.—John Johnston, recorder of deeds."   Johnston testified that he thought the writing in the word "street" on the original plat at this point was the same as in the word "street" written at other places on the plat, and that the ink as to the disputed word "street" indicated that it was written many years ago.   He says that the writing on the original plat seems to be in various hands, and that the plat might readily have been changed by someone outside of the recorder's office before his time.   We do not think the recorder was justified in writing the word "street" on the records. There would be little safety in titles to real estate if sixty years after transfers of property the title could be defeated by such evidence as caused the recorder to write in this word on the original records.   Even if competent proof had been

224—5

presented to show that the plat as originally made dedi-
cated the property in question west of said lot 1 as a street,
still it might well be questioned whether after the property
had been occupied, as the proof shows that this has been, for
more than sixty years, the public authorities would not be
estopped from claiming it. The north-east portion of the
premises has been occupied by mill buildings as far back as
any of the witnesses can remember.

On account of the gully, which has heretofore been re-
ferred to as occupying a part of the premises south-west of
the Truesdale mills, it is insisted that the city cannot be es-
topped from claiming this portion of the premises in ques-
tion, and it is also insisted that there was a public street
between the gully and the Truesdale mill. Counsel are mis-
taken in saying that the testimony shows that the drive-
way between the gully and the mill was a public street. A
fair reading of Mr. Truesdale's testimony shows that he
claims positively that it was a private driveway over the
Truesdale property. There is nothing in the record to indi-
cate to the contrary. Appellant's "Exhibit B," a plat of the
original town of Peoria made in 1826, indicates that Fay-
ette street stops at Water street. A fair construction of that
part of the order of the county commissioner's court in
1825, originally platted, which states, "all the streets shall
extend to low-water mark where the *fraction* on which the
town is situated *will admit*," indicates the same thing. All
that portion of the premises in question north-east of this
gully was occupied by the Truesdales for buildings and for
piling lumber up to the time the gully was filled up. This
gully seems to have been largely filled up long before the
dock was built, in 1886. That portion of the disputed prem-
ises south-west of the gully does not seem to have been in
continuous use until after the dock was constructed.

We agree fully with the contention of the city that the
Statute of Limitations as to adverse possession does not run
against a municipal corporation in respect to the property

held by it for public use, and that on the ground of adverse possession alone the court would not be justified in upholding the contention of appellee herein. (*Piatt County* v. *Goodell*, 97 Ill. 84; *City of Joliet* v. *Werner*, 166 id. 34; *Shirk* v. *City of Chicago*, 195 id. 298.) But the city allowed private parties to occupy the premises for more than sixty years. Buildings have been erected on the eastern part of the premises on a part of the so-called dedicated street, and have stood on the premises continuously since the early forties down to the present time. The taxes were paid to the city on a portion, at least, of the disputed premises during all the years since the patents were granted, for no matter what is understood to be the dividing line between said fractional sections 9 and 10, that portion of the premises said to be dedicated for a street by the original owners upon which the buildings stood was necessarily included in the description given in the tax receipts as well as in the deeds of conveyance. Docks were constructed at a very large expense in 1886, with the consent of the city authorities. It would be unjust and inequitable to allow the public authorities now to interfere. This court in *Lee* v. *Town of Mound Station*, 118 Ill. 304, says (p. 317): "We have held that where the public have long withheld the assertion of control over streets, and private parties have been, by the acts of those representing the public, induced to believe the streets abandoned by the public, and on the faith of that belief, and with the acquiescence of those representing the public, they have placed themselves, by making structures or improvements in the streets, in a situation where they must suffer great pecuniary loss if those representing the public be allowed afterwards to allege that the street was not abandoned, the doctrine of equitable estoppel may be applied." This doctrine may be applied to municipal corporations where justice and right require. A municipal corporation, no more than an individual, cannot profit by its wrongful acts. It may be estopped by its own conduct. (*City of Sullivan* v. *Tichenor*,

179 Ill. 97.) The city authorities, by all their acts from the time this property was first purchased from the government down to 1902, have led the property owners to believe that the land in question was private property and that the city had no claim to it. The city at this late day is estopped from making any such claim.

From a consideration of the entire record we conclude that there is nothing to justify this court in holding that the premises in question were ever dedicated as a street, and even if they were, the city is estopped from claiming title to them at the present time; that all of the disputed premises in question down to the dock line was conveyed by the government as a part of fractional section 10.

We find no reversible error in the record. The decree of the circuit court will accordingly be affirmed.

*Decree affirmed.*