[S.F. No. 23981. Mar. 20, 1981.]

THE STATE OF CALIFORNIA et al., Petitioners, v.
THE SUPERIOR COURT OF LAKE COUNTY, Respondent;
RAYMOND R. LYON et al., Real Parties in Interest.

212

**COUNSEL**

George Deukmejian, Attorney General, N. Gregory Taylor and Jan Stevens, Assistant Attorneys General, Denis Smaage, Stephen Mills and Richard M. Frank, Deputy Attorneys General, for Petitioners.

R. Frederic Fisher, Laurens H. Silver, James B. Frankel, F. Bruce Dodge, Palmer Brown Madden, Morrison & Foerster, P. A. Towner, Russell R. Kletzing, John Kramer and Katherine A. Striemer as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Charles D. Haughton, County Counsel, Robert L. Bridges, Deputy County Counsel, Edgar B. Washburn, Barbara L. Gately and Washburn, Kemp & Wagenseil for Real Parties in Interest.

Harry D. Miller, Karl E. Geier, Miller, Starr & Regalia, Green, Green & Rigby and Denslow Green as Amici Curiae on behalf of Real Parties in Interest.

OPINION

**MOSK, J.**—In *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515 [162 Cal.Rptr. 327, 606 P.2d 362], we reaffirmed the ancient doctrine that tidelands—lands between the lines of mean high tide and mean low tide—are owned by the public, that the state holds these lands in trust for the people for their use for commerce, navigation, fishing and other purposes, and that this trust interest is retained even if the title to tidelands has been conveyed to private persons, unless the conveyance has been made to promote the purposes of the trust.

The present case also concerns lands along the shoreline, but the issue here is the boundary between state and private ownership in non-tidal navigable lakes and streams between high and low water, i.e., lands alternately covered and uncovered by water as the level of the lake rises and falls with the seasons. The Attorney General, representing the People, claims that these lands are owned by the state, which acquired title thereto by virtue of its sovereignty upon admission to the Union, that they have not been conveyed to the owners of the lands along the shoreline, and that even if such conveyances have been made, the lands in dispute are subject to the trust described in *City of Berkeley*.

Raymond R. Lyon and Margaret L. Lyon, real parties in interest (hereafter called Lyon) own 800 acres along the shore of Clear Lake in

Lake County, a navigable body of water with an area of about 64 square miles. The portion of the property involved in the present dispute consists of more than 500 acres of marshland at the southern end of the lake, known as the Anderson Marsh, most of which is covered by water at certain times of the year. Lyon's predecessors in interest purchased the property from the state under patents issued between 1850 and 1906. These grants did not specify the waterward boundary of the land conveyed. Lyon sought to develop the property and applied for a permit to repair a levee for the purpose of reclaiming a portion of the marsh. The Fish and Game Commission notified him that it could not process his application for a permit because the State of California claimed ownership of the portion of the marsh which extends below the high water mark.

Lyon filed an action against the state and various of its agencies,[1] seeking to quiet title to the marsh, and for declaratory relief. He relied, inter alia, upon section 830 of the Civil Code.[2] The section, which was adopted in 1872, provides "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide-water, takes to ordinary high-water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."

The People filed a cross-complaint to quiet title in the state to the portion of the Anderson Marsh between high and low water and for declaratory relief. The County of Lake intervened in the action in its capacity as grantee in trust of the state's interest in the lands underlying the lake. (Stats. 1973, ch. 639, § 1, p. 1165.) The county supported Lyon's claim that he owns the property to the line of low water.

Lyon, the county, and the People, all moved for partial summary judgment based on their respective claims. The trial court ruled in favor of Lyon and the county (hereafter sometimes collectively referred to as Lyon); it determined that no portion of the Anderson Marsh lying landward of the ordinary low water mark of Clear Lake is sovereign

---

[1]Lyon joined the Department of Fish and Game and the State Lands Commission in the action. The commission has jurisdiction over the beds of navigable waters owned by the state or in which the state has an interest. (Pub. Resources Code, § 6301.)

[2]All references are to the Civil Code unless otherwise noted.

property of the state or subject to a common law public trust, but that the waters of the lake are impressed with a public servitude so that when the water rises above the low water mark, the public has the right to navigate between that line and the ordinary high water mark. The People seek a writ of mandate to compel the trial court to vacate its order, and to grant the People's motion for partial summary judgment.

The case involves issues which are of vast importance to the general public as well as to the owners of land bordering upon navigable lakes and streams. The significance of these issues has generated extensive briefs by amici curiae,[3] and their analyses and arguments have been of considerable assistance to the court. No less than 4,000 miles of shoreline along 34 navigable lakes and 31 navigable rivers in the state are involved. Substantial areas of land will be affected by our decision; at Clear Lake alone, there is a difference of 5,000 acres in the surface area of the lake between high and low water, and the Anderson Marsh constitutes one-half of the remaining fresh water marsh at Clear Lake. Lands of the type involved in this proceeding constitute a resource which is fast disappearing in California; they are of great importance for the ecology, and for the recreational needs of the residents of the state.

Lyon's claim to the fee ownership of Anderson Marsh to the low water line is based on the following reasoning: California never acquired title to the beds underlying navigable nontidal waters above low tide. The United States Supreme Court has made it plain that the ownership of such lands is a matter of state rather than federal law. (*Hardin* v. *Jordan* (1891) 140 U.S. 371, 382 [35 L.Ed. 428, 433, 11 S.Ct. 808]; *Barney* v. *Keokuk* (1876) 94 U.S. 324, 338 [24 L.Ed. 224, 228].) The states exercised their options with regard to ownership of such land by adopting different rules; some states claim only to low water, some to high water, and others make no sovereign claim to the beds of nontidal bodies. Indeed, only a minority of states claim sovereign ownership to high water.[4] When California entered the Union, it

---

[3]The Department of Water Resources has filed an amicus brief in support of the People, as have the Sierra Club and the Natural Resources Defense Council (joint brief) and the Audubon Society and Friends of the Earth (joint brief). The California Land Title Association and the California Association of Realtors (hereafter referred to as California Land Title Association) have filed a joint brief on behalf of Lyon, and the Upper San Joaquin River Association also supports Lyon's position.

[4]Approximately 20 states adopt a low water line for navigable lakes and rivers, a few allow private ownership to the middle of the water, and other jurisdictions have adopt-

determined to exercise no sovereign claim to the beds of nontidal navigable waters. This choice was made when, upon admission to statehood, the Legislature adopted a statute which provided that unless inconsistent with applicable federal or state law, the "Common Law of England shall be the rule of decision in all the Courts of this State." (Stats. 1850, ch. 95, p. 219.) Under English common law, the sovereign made no claim to ownership of lands underlying nontidal waters. Therefore, by the adoption of the English common law, California made no claim to ownership of the beds of such waters. Subsequently, by the enactment of section 830 in 1872, the state determined to claim title only to low water.

The People contend, on the other hand, that California acquired title to the lands in question to the high water mark in its sovereign capacity upon statehood, citing, inter alia, *State Land Board* v. *Corvallis Sand & Gravel Co.* (1977) 429 U.S. 363, 370-371 [50 L.Ed.2d 550, 558-559, 97 S.Ct. 582]; *Barney* v. *Keokuk, supra,* 94 U.S. 324, 338. Moreover, argue the People, section 830 did not grant such lands to private persons because that provision only sets forth a rule for the construction of deeds and does not constitute a grant of sovereign land.

We consider, first, whether California acquired sovereign ownership in the lands between low and high water in nontidal navigable lakes and rivers upon admission to the Union. If this question is answered in the negative, the People's claim to fee ownership of these lands cannot prevail. If, on the other hand, the state owned the property in question at the time of admission to the Union, it will be necessary to decide whether, by the enactment of section 830 in 1872, it granted an interest therein to riparian landowners and, if so, the extent of the interest conveyed.

We begin with the proposition that, even accepting Lyon's assertion that the state did not automatically succeed to title to the beds of navigable nontidal lakes and streams to high water upon statehood but only had the option to make such a claim, absent an indication that the new state declined to exercise sovereign ownership of such lands, we would be compelled to decide the issue in favor of the state's title. The only basis for a claim that California abdicated its rights to claim to high

---

ed different rules for lakes and rivers. Ten jurisdictions have adopted the high water rule. (See fn. 9 at p. 222, *post.*)

water in 1850 was the adoption of the common law of England as the rule of decision in this state.[5]

In England, there were different rules concerning the ownership by private persons of the beds of tidal waters and nontidal waters. Nontidal rivers and lakes were privately owned; a riparian holder took to the middle of the lake or the thread of the stream, much like the landowner along a public street. At the same time, the beds of all navigable waters were said to belong to the crown, and the King held such property in trust for the public and could not dispose of it free of that trust. Only waters where the tide ebbed and flowed were considered to be navigable in England. The reason for the difference in these rules is readily explainable: in England there were no navigable streams of any importance beyond the ebb and flow of the tide. Therefore, the terms "navigable" and "tidal" became synonymous; tidal (navigable) waters came to mean public waters, while nontidal (and in England nonnavigable) waters came to mean private waters. (*The Propeller Genesee Chief et al.* v. *Fitzhugh et al.* (1851) 53 U.S. (12 How.) 443, 454-458 [13 L.Ed. 1058, 1063-1065]; *Barney* v. *Keokuk, supra*, 94 U.S. 324, 338.)[6]

Some of the original 13 states adopted the common law rule early in their history, for the same reason that the rule was appropriate in England, i.e., most of their waters were tidewaters, and until the use of steamboats "there could be nothing like foreign commerce upon waters with an unchanging current resisting the upward passage." (*The Propeller Genesee Chief*, 53 U.S. at p. 455 [13 L.Ed. at p. 1063].) However, the English rule was obviously inappropriate as the nation

---

[5]The disagreement between the parties in this regard appears to focus not upon the question whether the state had the power to grant these lands to private persons, but upon when such power was exercised, i.e., when California entered the Union or thereafter. The People urge that the state succeeded to the ownership of the lands in question to high water as an inherent aspect of sovereignty, although sovereignty implies that after admission to the Union the state had the power to grant them to private persons. Lyon argues, on the other hand, that California never owned these lands but only had the option to claim ownership, and when it was admitted to the Union, by the adoption of the common law in 1850 and section 830 in 1872, the state elected not to exercise its right to claim ownership of the land between low and high water.

[6]The People contend that although the common law rule has generally been assumed to be as described above, there is some authority for the proposition that the tidal character of a body of water was not a critical factor in England in the determination of navigability. Numerous cases in addition to those referred to above support our characterization of the English rule. We need not discuss the authorities upon which the People rely, since we shall conclude that the common law test was not adopted in California.

expanded westward, where there were great rivers and lakes which were navigable in fact, even though they were not subject to the ebb and flow of the tide. These distinctions, and the inapplicability of the common law rules to conditions in much of the United States were recognized as early as 1851 by the United States Supreme Court. In *The Propeller Genesee Chief* it was held that the federal government had admiralty jurisdiction in rivers and lakes which were navigable in fact, whether or not the tide ebbed and flowed therein. In 1856, the courts of this state recognized that the tidal character of a body of water was not a proper test of navigability. (*American Water Co.* v. *Amsden* (1856) 6 Cal. 443, 446.)

The question of public ownership of navigable rivers and lakes was discussed in *McManus* v. *Carmichael* (1856) 3 Iowa 1. That case, which involved the boundary of public ownership along the Mississippi River, contains an exhaustive analysis of the common law rule of England and its application by early American courts. The court held that only those parts of the common law which were suitable to the conditions in Iowa were adopted by the new state. The opinion asks, rhetorically and somewhat floridly, "whether the rules and tests which are applicable enough to the rivulets of England, shall be taken to measure those waters whose flow is through the climates and zones of the earth?" (*Id.* at p. 31.) Needless to say, it held that the state owned the beds of navigable nontidal bodies to high water, and that the common law rule was inappropriate to the United States because the great nontidal rivers and lakes in this country are navigable in fact. Other states recognized the inapplicability of the English rule to conditions in this country prior to 1850. (E.g., *Carson* v. *Blazer* (Pa. 1810) 2 Binn. 475, 484-486; *Cates* v. *Wadlington* (S.C. 1822) 1 McCord 580, 582.)

In *Barney* v. *Keokuk, supra,* 94 U.S. 324, the high court considered the rule declared in *McManus,* and left no doubt the correct doctrine was laid down by that case, i.e., that the states own the beds of navigable nontidal bodies to high water, and that the common law is inapplicable to conditions in the United States. Nevertheless, it held that states which had adopted the common law rule had the power to determine whether "as rules of property" it would be safe to change their adherence to the common law. After reaching these conclusions, the court made a statement upon which Lyon places great reliance: "If they [the states] choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others

to raise objections." (*Id.* at p. 338 [24 L.Ed. at p. 228].) Later cases repeated the proposition that the states are free to determine the ownership of lands below high water mark in navigable nontidal lakes and streams. (*Hardin v. Jordan, supra,* 140 U.S. 371, 382 [35 L.Ed. 428, 433]; *Shively v. Bowlby* (1894) 152 U.S. 1, 40 [38 L.Ed. 331, 346, 14 S.Ct. 548].)

■ With this background, we consider whether we are compelled to conclude, as Lyon asserts, that by the adoption of the English common law in 1850, California accepted the rule of private ownership of nontidal navigable waters so that title to their beds was never in the state but was granted directly to private riparian owners. We do not so conclude.

First, our courts have never adhered slavishly to common law doctrines if they were unsuitable to the circumstances of our people or if the conditions were those never contemplated by the common law. (*Van Ness v. Pacard* (1829) 27 U.S. (2 Pet.) 137, 143-144 [7 L.Ed. 374, 376-377]; *Jones v. California Development* (1916) 173 Cal. 565, 573-574 [160 P. 823].) *Crandall v. Woods* (1857) 8 Cal. 136, 142-143, referred to the English test of navigability as a rule "framed with special reference to the physical condition of a country differing widely from our own." The law is replete with situations in which this and other jurisdictions which adopted the common law have refused to follow those aspects which were unsuitable to local conditions. (See Traynor, *Statutes Revolving in Common-Law Orbits* (1968) 43 State Bar J. 509, 518 et seq.; Hall, *The Common Law* (1951) 4 Vand.L.Rev. 791, 805 et seq.) If we were to hold, as Lyon urges, that the adoption of the common law in 1850 signified the acceptance in this state of the English rule regarding the ownership of the lands in question, we would "apply a rule founded on a particular reason, to a case where that reason utterly fails." (*Crandall* at p. 143.)[7]

---

[7]Lyon appears to argue that because *The Propeller Genesee Chief* was not decided until 1851, the year after California entered the Union, and *Barney* was not decided until four years after section 830 was enacted into law, the holdings of these cases may not be considered in deciding whether California, by adopting common law rules, intended to relinquish the state's right to claim ownership of the beds of navigable nontidal waters. We cannot agree. These cases and many others (including some cases cited above decided before 1850) demonstrate that the common law rule regarding nontidal waters is inappropriate to conditions in this state. The concept that only common law doctrine applicable to local conditions has been incorporated into our law is as old as the state itself.

Rejection of the common law rule is also supported by the enactment of section 830 in 1872. As we have seen, under English common law, a riparian landholder owned land beneath nontidal waters to the middle of the lake or the thread of the stream; the King had no ownership interest in such lands. Under the terms of section 830, according to Lyon, the boundary between public and private ownership was set at the low water line. If we were to accept Lyon's assertion, we would be led to the entirely irrational conclusion that, although California, by the adoption of the common law in 1850, granted fee title to lands beneath navigable nontidal waters to the center line, 22 years later it deprived riparian owners of their property to the center by the enactment of section 830, and decreed that thenceforth they owned only to the low water mark.[8]

Finally, we observe that the jurisdictions which hold the high water line to be the boundary between private and public ownership have also adopted the common law as the rule of decision.[9] These cases demonstrate that there is an inconsistency between not accepting the English rule regarding the ownership of the beds of nontidal navigable lakes and rivers and the adoption of the common law as the rule of decision.

---

[8]*Wright* v. *Seymour* (1886) 69 Cal. 122, 127 [10 P. 323], is relied upon by Lyon for the proposition that section 830 merely codified the common law. It is true that the decision states the section is a "declaration of the law ... as it has existed since the formation of our state government." However, this statement was made with reference to the portion of section 830 relating to tidal waters.

Lyon does not directly discuss the inconsistency between his assertions regarding the common law and the effect of section 830. He claims that the state "may have followed the English common law prior to 1872, and made no claims to the beds of non-tidal navigable waters," and that section 830 "finally resolved any uncertainty about prior common law rules in California." The problem with this approach is that it skirts the critical issue whether the state or private persons owned the beds of navigable nontidal bodies to high water between 1850 and 1872. If California followed the English common law, then private persons owned these lands to the center line and were deprived of their property between that line and low water by the enactment of section 830. If, as we conclude above, the common law rule was not adopted in this respect, then the lands were owned by the state to high water, at least until 1872. Amicus curiae California Land Title Association, recognizing this anomaly, asserts that enactment of section 830 amounted to an unconstitutional taking of lands of riparian owners between the center line and low water mark.

[9]Alaska (*State, Dept. of Natural Resources* v. *Pankratz* (1975) 538 P.2d 984, 988); Arizona (*State* v. *Bonelli Cattle Company* (1971) 107 Ariz. 465 [489 P.2d 699, 701-702], revd. on other grounds (1973) 414 U.S. 313 [38 L.Ed.2d 526, 94 S.Ct. 517], overruled in *Corvallis Sand & Gravel Co., supra*, 429 U.S. 363, 382 [50 L.Ed.2d 550, 565]); Arkansas (*Anderson* v. *Reames* (1942) 204 Ark. 216 [161 S.W.2d 957, 959]); Florida (*Martin* v. *Busch* (1927) 93 Fla. 535 [112 So. 274, 283]); Idaho (*Gasman* v. *Wilcox* (1934) 54 Idaho 700 [35 P.2d 265, 266]); Kansas (*Siler* v. *Dreyer* (1958) 183

The conclusion follows that California succeeded to the ownership of the beds of such waters upon its admission to the Union, to the high water mark.

▮ We next consider whether the Legislature granted the lands in question to private persons by the enactment of section 830 in 1872. We do not doubt that the state had the power to make such grants. (See, e.g., *State Land Board* v. *Corvallis Sand & Gravel Co., supra,* 429 U.S. 363, 375 [50 L.Ed.2d 550, 561]; *Barney* v. *Keokuk, supra,* 94 U.S. 324, 338; *Hardin* v. *Jordan, supra,* 140 U.S. 371, 382 [35 L.Ed. 428, 433].) The question is whether section 830 was intended to accomplish this result.

As we have seen, the section provides that "[e]xcept where the grant under which the land is held indicates a different intent, the owner of the upland, . . . when it borders upon a navigable lake or stream, where there is no tide, . . . takes to the edge of the lake or stream, at low water mark. . . ."[10] Section 830 was a part of the Field Code, and when it was enacted in 1872, the Legislature added section 670 as well as section 2077 of the Code of Civil Procedure. Section 670 provides that the state is the owner of "all land below the water of a navigable lake or stream. . . ." Section 2077 sets forth rules for construing conveyances in situations where the construction is doubtful. It provides that a deed to land bordering a navigable nontidal lake is to be construed as conveying the right of the grantor to low water mark.

The People urge that section 670 is a rule of property, and sections 830 and 2077 are rules of construction. They point out that section 830 contains no words of conveyance, such as "grant" or "quitclaim," and

---

Kan. 419 [327 P.2d 1031, 1033]); Oklahoma (*State* v. *Nolegs* (1914) 40 Okla. 479 [139 P. 943, 946]); Oregon (*Brusco Towboat Co.* v. *State, By and Through Straub* (1977) 30 Ore.App. 509 [567 P.2d 1037, 1040, 1042]); Utah (*Provo City* v. *Jacobson* (1947) 111 Utah 68 [181 P.2d 213, 214]; Washington (*State* v. *Superior Court* (1912) 70 Wash. 442 [126 P. 945, 947]).

[10]As originally enacted, the section did not contain the introductory clause. It read, "When land borders upon tide water, or upon water which constitutes an exterior boundary of the State, the owner of the upland takes to high water mark; when it borders upon a navigable lake where there is no tide, the owner takes to the edge of the lake at low water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream." The statute was amended in 1874 to its present form. (Stats. 1873-1874, Amend. to the Codes, ch. 612, p. 220.) The People rely upon this change as indicating that the section was intended to set forth only a rule of construction.

argue that to construe the section as a grant of thousands of linear miles of lands owned by the public would violate the rule that grants by the public to a private party are to be construed in favor of the public. (§ 1069; *People* v. *Centr-O-Mart* (1950) 34 Cal.2d 702, 703 [214 P.2d 378]; *Oakland* v. *Oakland Water Front Co.* (1897) 118 Cal. 160, 174-175 [50 P. 277].) Lyon claims, on the other hand, that section 830 constitutes a rule of property, and that by enactment of the section, the state granted to riparian owners the lands to low water.

The parties cite numerous cases in support of their respective positions as to the interpretation of the section. We have examined these cases, and we find that while they contain dicta, suggestions, and implications from which one side or the other may take comfort, none contains a direct holding on the question whether section 830 was intended to constitute a grant of property between high and low water in navigable lakes and rivers.

Lyon relies upon *Packer* v. *Bird* (1886) 71 Cal. 134 [11 P. 873]. In that case, the plaintiff claimed ownership of an island in a navigable portion of the Sacramento River, asserting that his patent extended to the thread of the stream, which included the island. The court held that his title went only to the "edge of the stream" and did not include the island. The quoted words are obviously ambiguous, but Lyon, in support of the argument that the "edge of the stream" means low water, relies upon the briefs of the parties in the case, which discussed the import of sections 830 and 670. Reference in a brief to these statutes is insufficient to clarify the ambiguous language employed by the court.[11]

The case most favorable to the position of Lyon is the *City of Los Angeles* v. *Aitken* (1935) 10 Cal.App.2d 460 [52 P.2d 585]. There the court declared that the title of private landholders in a navigable nontidal lake extended to low water mark, citing section 830, and that the state was the owner below low water, citing section 670. However, the statement was dictum, since the only issue in the case was whether Los Angeles, which sought to condemn fee simple title to the littoral rights

---

[11]*Packer* was affirmed by the United States Supreme Court, which also employed ambiguous language in its decision. (*Packer* v. *Bird* (1891) 137 U.S. 661, 672 [34 L.Ed. 819, 822, 11 S.Ct. 210].) Later decisions of the high court cited *Packer* for the proposition that the jurisdiction of California in nontidal navigable waters extends to high water. (*Hardin* v. *Jordan, supra,* 140 U.S. 371, 382-383 [35 L.Ed. 428, 433-434]; *Shively* v. *Bowlby, supra,* 152 U.S. 1, 44-45 [38 L.Ed. 331, 347-348].)

of landowners to maintain the natural level of the lake, could avoid payment of substantial damages because of the poor quality of the water for domestic use.[12]

The People rely primarily on *Churchill Company v. Kingsbury* (1918) 178 Cal. 554 [174 P. 329]. In that case, the petitioner sought to compel the surveyor-general to perform acts preliminary to issuance of a patent for the lands between high and low water in Little Klamath Lake, which the court found to be navigable. The petitioner relied upon the terms of an 1893 statute in support of his claim. It was held that the statute did not authorize the issuance of the patent. In the course of its opinion, the court noted that the petitioner took the position that "the land is, in fact sovereign land of the state, and in this, we think it is clearly right." (178 Cal. at p. 558.) The statement was dictum, the court did not cite section 830, and Lyon points out that the briefs of the parties in the case did not bring the section to the attention of the court. (See also *People v. Morrill* (1864) 26 Cal. 336, 356.)

If the decisional law is ambiguous regarding whether section 830 constitutes a grant or a rule for the construction of deeds, the same cannot be said of the administrative interpretation of the provision. Lyon has produced a voluminous body of evidence demonstrating that, with few exceptions, state authorities, including the Attorney General, took the position until at least 1970 that by virtue of the provisions of section 830 the state claimed ownership only to the low water mark. (See 43 Ops.Cal.Atty.Gen. 291, 295 (1964); 30 Ops.Cal.Atty.Gen. 262, 269 (1957); 23 Ops.Cal.Atty.Gen. 306, 307 (1954); 23 Ops.Cal.Atty.Gen. 97, 98 (1954).) In 1970, the Attorney General reexamined this position, and reversed his opinion, and in the trial of a condemnation action involving the Feather River (People v. Shasta Pipe and Supply Co., Sup. Ct. Butte Co., No. 37390, and in other actions thereafter, assert-

---

[12]Other cases relied upon by Lyon either make no reference to section 830 (*Maginnis v. Hurlbutt* (1920) 49 Cal.App. 460 [193 P. 606]; *Crews v. Johnson* (1962) 202 Cal. App.2d 256, 258 [21 Cal.Rptr. 37] [in a dispute between adjoining littoral owners at Clear Lake, the court stated that the parties conceded that private ownership of the submerged lands extended to low water]) or refer to the section but do not discuss its meaning (*Craig v. White* (1921) 187 Cal. 489, 492 [202 P. 648] [the court cited § 830 for the proposition that patents issued by the federal government conveyed title to the patentees to "the actual margin of the lake"]; *Foss v. Johnstone* (1910) 158 Cal. 119, 130 [110 P. 294] [citing § 830 as setting forth "certain incidents attaching to lands bordering upon waters" in a case involving a nonnavigable pond].) In *United States v. Gossett* (9th Cir. 1969) 416 F.2d 565, 568-569, the court classified California as a low water jurisdiction, apparently based largely upon the disclaimer by California's Attorney General to ownership of the state above that line.

ed that the state owned the land under navigable lakes and streams to high water. In 1977, the Attorney General advised the State Lands Commission of this position.

According to affidavits, the files of the State Lands Commission contain hundreds of letters stating or implying that the state's ownership extends waterward of the ordinary low water mark.

Finally, the Legislature has impliedly accepted the low water mark of Clear Lake as the boundary of the state's ownership. The state has conveyed to Lake County its title to Clear Lake, in trust. The language of the grant assumes that the state's interest is to low water mark. (Stats. 1973, ch. 639, § 1, p. 1165.)[13]

We are aware of the rule that the administrative construction of a statute is not necessarily determinative (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 756-757 [151 P.2d 233, 155 A.L.R. 405]), but we cannot ignore these long-continued and frequently expressed views to the effect that section 830 constitutes a grant to private persons of title to the beds of navigable nontidal bodies to low water mark. It cannot be said that the statute is so clear and unambiguous that these expressions may be disregarded. In this connection, we note that two states which adopted a statute similar to section 830 as part of the Field Code, interpret their enactments as conveying title to riparian owners to the low water mark in navigable nontidal waters. (Mont. Rev. Codes 1947, § 67-712; *Herrin* v. *Sutherland* (1925) 74 Mont. 587 [241 P. 328, 331, 42 A.L.R. 937]; N.D. Cent. Code, § 47-01-15; *Hoque* v. *Bourgois* (N.D. 1955) 71 N.W.2d 47, 52 [54 A.L.R.2d 633].)[14]

---

[13]Section 1 of the statute, after granting to the county, in trust, the state's interest in Clear Lake, provides, "The low water mark for Clear Lake has not been determined, and such determination may have to be made by judicial adjudication. Subject to such later determination and for the purpose of the administration of this grant only, the low water mark shall be considered by the parties to this grant as being zero on the Rumsey Gauge." The Rumsey Gauge refers to a method by which Captain George Rumsey established the level of Clear Lake. The intersection of zero on that gauge with an elevation of 1,318.65 feet may represent the low water mark of the lake.

[14]There is no merit in the argument of the People that because section 830 has been employed to construe deeds in disputes involving nonnavigable waters (*Hess* v. *Merrell* (1947) 78 Cal.App.2d 896, 899-900 [178 P.2d 467]) and tide waters (*Lynch* v. *Kupfer* (1933) 134 Cal.App. 652, 656 [26 P.2d 33]), the provision cannot be viewed as a rule of property in nontidal cases. We find nothing inconsistent in the notion that the provision may state a rule of property and may also constitute a rule for the construction of deeds.

We conclude, therefore, that Lyon has title to the low water mark of Clear Lake.

■ We come, then, to the question whether the grant of lands between high and low water made by section 830 to riparian land-holders is free of the trust described in *City of Berkeley*. It is well settled that if the state holds these lands in trust for the benefit of the public, its conveyance of title to private persons does not necessarily free the property from the burden of the public trust. Instead, unless the conveyance is made for the purpose of promoting trust goals, the grantee takes title subject to the rights of the public. This was the holding in *City of Berkeley* and in *People v. California Fish Co.* (1913) 166 Cal. 576, 596 [138 P. 79].

In *City of Berkeley*, we were concerned with whether 22,299 acres of tidelands in San Francisco Bay, granted to private persons by deeds purportedly in fee, between 1868 and 1870, were subject to the tidelands trust. We answered this question in the affirmative. We observed that under the venerable doctrine of the tidelands trust, which had its origin in Roman law, tidelands are owned by the state in trust for the public, for their use for commerce, navigation, fishing, recreation, or for the purpose of preserving the property in its natural state. Grants of such lands to private persons are subject to the trust unless the conveyances are made to enhance trust purposes. We determined that the grants in question were not made for such purposes, and that in any event, the state was not empowered to make such vast grants to private parties in its role as trustee.

The holding of *California Fish* is similar. There it was decided that, although various statutes authorizing the alienation of tidelands into private ownership effectively passed title, the grantees took subject to the rights of the public because the grants in question were not made for the purpose of promoting the aims of the trust.

Lyon and amicus California Land Title Association urge that there is not and never has been a doctrine that nontidal navigable waters are subject to a public trust. Rather, they claim, such waters are impressed only with a "recreational or navigational easement" which allows the public to use only the waters, so that when they rise above low water mark, the public may use them for navigation or fishing, but the bed between low and high water belongs to the riparian owner and when the

water recedes the public has no right to use of the land above the low water mark.

The People and supporting amici curiae rely upon article X, section 4 of the Constitution,[15] which provides for freedom of access to and the right of navigation upon waters that are navigable. They rely also upon numerous cases which declare that California owns the lands under navigable waters in trust, without distinguishing between tidal and non-tidal bodies in this regard. (See, e.g., *Colberg, Inc.* v. *State of California* (1967) 67 Cal.2d 408, 416 [62 Cal.Rptr. 401, 432 P.2d 3]; *Boone* v. *Kingsbury* (1928) 206 Cal. 148, 189 [273 P. 797]; *People* v. *Gold Run D. & M. Co.* (1884) 66 Cal. 138, 151 [4 P. 1152].)

In our view, *Illinois Central Railroad Company* v. *Illinois* (1892) 146 U.S. 387 [36 L.Ed. 1018, 13 S.Ct. 110], which we described in *City of Berkeley* as the "seminal case on the scope of the public trust doctrine" (26 Cal.3d at p. 521), settled the issue. It held very clearly that the applicability of the public trust doctrine does not turn upon whether a body of water is subject to the ebb and flow of the tide, but upon whether it is navigable in fact.

*Illinois Central* involved a grant by the State of Illinois of 1,000 acres of the bed of Lake Michigan constituting the entire harbor of the City of Chicago, to the Illinois Central Railroad. The high court held that the grant was revocable, that the state held these lands in trust for the public, and that it was powerless to relinquish its rights as trustee. The opinion addressed itself specifically to whether the trust doctrine was inapplicable because there was no appreciable tide in Lake Michigan. It rejected this premise in the following unmistakable language: " . . . by the common law, the doctrine of the dominion over and owner-ship by the crown of lands . . . under tidewaters is not founded upon the existence of the tide over the lands, but upon the fact that the waters are navigable, tide waters and navigable waters . . . being used as synonymous terms in England. The public being interested in the use of such waters, the possession by private individuals of lands under them

---

[15]This provision was adopted in 1879 as article XV, section 2. It states: "No indivi-dual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

could not be permitted except by license of the crown, which could alone exercise such dominion over the waters as would insure freedom in their use so far as consistent with the public interest. The doctrine is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment, a reason as applicable to navigable fresh waters as to waters moved by the tide. We hold, therefore, that the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies, which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and that the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations." (146 U.S. at pp. 436-437 [36 L.Ed. at pp. 1036-1037].)

Lyon and amicus California Land Title Association insist that the holding of *Illinois Central* is confined to the Great Lakes, which are "special because of their size and importance in interstate commerce." While it is true that the opinion emphasizes the importance of the Great Lakes for commerce, the portion of the opinion quoted above makes it clear that it is navigability which is the touchstone in determining whether or not the public trust applies. The application of the trust doctrine to tidal waters is not confined to those bodies which are huge in size and important for purposes of commerce; we can see no reason why such a test should not be applied to nontidal waters. Nor does *Illinois Central* set forth a special rule relating to Lake Michigan. Other jurisdictions have recognized that the doctrine enunciated in that case applies to nontidal bodies which cannot be characterized as "inland seas." (E.g., *State v. Southern Sand & Material Co.* (1914) 113 Ark. 149 [167 S.W. 854, 856]; *State v. Korrer* (1914) 127 Minn. 60 [148 N.W. 617, 623]; *Flisrand v. Madson* (1915) 35 S.D. 457 [152 N.W. 796, 801]; *Hazen v. Perkins* (1918) 92 Vt. 414 [105 A. 249, 251, 23 A.L.R. 748]; *State v. Public Service Commission* (1957) 275 Wis. 112 [81 N.W.2d 71, 73-74.])[16] It is noteworthy that South Dakota, like California, has adopted a provision similar to section 830 but, as *Flisrand* makes clear, the state has impressed a trust for public uses on the riparian owner's property between high and low water.

---

[16]In support of this assertion, Lyon states that other navigable waters in Illinois, such as the Mississippi River, are owned by private parties. (Citing *City of St. Louis v. Rutz* (1891) 138 U.S. 226, 242 [34 L.Ed. 941, 947-948, 11 S.Ct. 337]; *Peoria v. Central Nat. Bank* (1906) 224 Ill. 43 [79 N.E. 296, 299].) In *Appleby v. City of New York* (1926) 271 U.S. 364, 395 [70 L.Ed. 992, 1004, 46 S.Ct. 569], it was said that although *Illinois Central* was "necessarily a statement of Illinois law," the general principle declared therein has been recognized throughout the country.

Another matter of interest in this connection is that an opinion of the California Attorney General relied upon by Lyon for the proposition that section 830 has been interpreted by state officials as setting a low water boundary for public ownership explicitly qualified this opinion by the statement that the riparian owner's title between low and high water is held in trust to preserve the rights of commerce and navigation for the public. (43 Ops.Cal.Atty.Gen., *supra*, 291, 294.)[17]

Our conclusion that the public trust is applicable to nontidal waters is also pertinent to the consideration of Lyon's argument, apparently accepted by the trial court, that as to the area between high and low water the public has an interest only in the water itself, so that it may use the water for boating and fishing, but when a lake or stream is at low water, the public has no right to use the bed to the high water mark. In *Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259 [98 Cal.Rptr. 790, 491 P.2d 374], we held that, although early cases had expressed the scope of the public's right in tidelands as encompassing navigation, commerce and fishing, the permissible range of public uses is far broader, including the right to hunt, bathe or swim, and the right to preserve the tidelands in their natural state.

We see no justification in reason or authority for the proposition advanced by Lyon. In *People* ex rel. *Baker* v. *Mack* (1971) 19 Cal. App.3d 1040 [97 Cal.Rptr. 448], relied upon by Lyon as holding that the public interest in nontidal waters is confined to the waters themselves, the primary issue was the navigability of a section of the Fall River, which defendants had obstructed by erection of booms, fences and bridges, preventing plaintiff from boating, hunting and fishing in the stream. The court adopted a broad definition of navigability, holding that any waters which could be used for recreation were navigable and could be used by the public. In the course of its opinion, the court made the following statement, upon which Lyon relies: "[M]embers of the public have the right to navigate and to exercise the incidents of navigation in a lawful manner at any point below high water mark on

---

[17]The opinion states, "[U]pon its admission to the Union, California acquired title to all land below the high water mark of all navigable water within its territory, whether or not such water was tidal. This title is held in trust for the people of the State, in order to preserve the right of commerce and navigation for the public. . . .

"There is no requirement that the state claim all land below high water mark. As long as the rights of the public are not impaired, the state may permit private ownership of land beneath non-tidal, navigable waters."

waters of this state which are capable of being navigated by oar or motor-propelled small craft." (19 Cal.App.3d at p. 1050.)

We fail to see how Lyon can find comfort in this statement. It does not mean that the public's rights are confined to the waters as such, but merely attempts to distinguish between waters capable of commercial use—which were there claimed to be the test of navigability—and those capable of recreational use. Other cases cited by Lyon also fail to support his position.[18]

Nevertheless, argues Lyon, there is a sound reason in logic why tidal and nontidal waters should be treated differently insofar as these public rights are concerned. He asserts that because tidelands are subject to inundation on a daily basis and nontidal waters are inundated only seasonally, tidelands are constantly subject to use for commerce, navigation and fishing, while the strip of land between low and high water in a nontidal body is only useful for such purposes for a limited portion of the year. Therefore, he concludes, the necessity for impressing nontidal waters with the public trust is greatly reduced.

But this contention is predicated on an exceedingly narrow view of the purposes of the public trust. As Justice McComb pointed out for a unanimous court in *Marks* v. *Whitney, supra*, 6 Cal.3d 251, 259, the public's rights in tidelands are not confined to commerce, navigation and fishing, but include recreational uses and the right to preserve the tidelands in their natural state. We discern no valid reason why the scope of the public's right in nontidal waters should not be equally broad. Lyon's assertions in this regard imply the resurrection of the common law distinction between tidal and nontidal waters—a distinc-

---

[18]*Hitchings* v. *Del Rio Woods Recreation & Park Dist.* (1976) 55 Cal.App.3d 560 [127 Cal.Rptr. 830], was an action for declaratory relief to determine whether a certain portion of the Russian River was navigable. The court adopted the broad recreational use test of navigability set forth in *People* ex rel. *Baker* v. *Mack, supra*, 19 Cal.App.3d 1040, 1050, and held that the river was deemed in law to be navigable even though it was not in fact navigable for some part of the year.

In *Bohn* v. *Albertson* (1951) 107 Cal.App.2d 738 [238 P.2d 128], a tract of land was flooded when a levee broke. The flooding converted the land into a navigable body of water, upon which pleasure boats sailed and the public fished. It was held that the landowner could not charge the public for use of the water because while it was subject to recreational use it was a navigable body. However, the court held that the landowner had the right to reclaim the land since he had not lost title when it was suddenly flooded by the break in the levee, in accordance with the established rule governing avulsion.

tion which has been thoroughly discredited in this country. As was said in *Illinois Central*, when the United States rejected the English rule that admiralty jurisdiction was confined to tidewaters because it was inapplicable to the conditions in this country, "the limitation and all its incidents were discarded." (146 U.S. 387 at p. 436 [36 L.Ed. 1018 at p. 1036].) We hold that the same incidents of the trust applicable to tidelands also apply to nontidal navigable waters and that the public's interest is not confined to the water, but extends also to the bed of the water.

In *California Fish* it was held that a statute authorizing the conveyance of tidelands will not be interpreted to abandon the public trust unless no other interpretation is reasonably possible. Nothing in the language of section 830 requires a conclusion that riparian landholders take free of the public's rights in the lands between low and high water in navigable lakes and streams. We conclude, therefore, that Lyon's title to such lands is impressed with the public trust.

Lyon's final argument is that his ownership of the Anderson Marsh to low water free of the public trust is a "rule of property" and that a determination applying a trust to such property would accomplish a taking of private property in violation of federal and state constitutional provisions. He relies upon cases which recognize the protection of property rights afforded by the federal and state Constitutions. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 561, 92 S.Ct. 2701]; *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 273-274 [157 Cal.Rptr. 372, 598 P.2d 25]; *House* v. *L.A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 391 [153 P.2d 950].) ■ ■■■ We doubt whether any failure of the state to previously assert its trust rights in the lands below high water (but see 43 Ops. Cal. Atty. Gen., *supra*, 291, 294) constitutes a "rule of property."[19]

---

[19]In *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 456 [326 P.2d 484], a "rule of property" was defined as "A settled rule or principle, resting usually on precedents or a course of decisions, regulating the ownership or devolution of property.... The principle appears to be an extension of the '*stare decisis*' rule, which ... seems to apply with peculiar force and strictness to decisions which have determined questions respecting real property and vested rights...."

Lyon's reliance on the "rule of property" which he espouses is open to question. The agreement under which he purchased Anderson Marsh provides that the seller does not warrant ownership of lands below zero mark on the Rumsey Gauge, and it makes provision to set aside some of the purchase monies in trust in the event a governmental body claims property above that point. Moreover, title insurance policies relating to the

Indeed, in some respects, our holding constitutes less of an interference with property rights than occurred in *Illinois Central, California Fish*, and *City of Berkeley*. In those cases, the landowners had received outright grants from the state, purportedly in fee, while the title of Lyon to the lands in issue here is based only upon administrative interpretation of an ambiguous statute. In *Illinois Central* the high court held that the grant of the lands in question was revocable—not merely that the railroad held the property subject to the trust—on the ground that "[t]here can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it." (146 U.S. 387, at p. 460 [36 L.Ed. 1018, at p. 1045].) And, in *California Fish*, in response to an argument by the grantees that the public should be estopped to claim any interest in the tidelands it had sold into private ownership, the court declared that the grantees had received title to the soil (subject to the public trust), and that they had "received consideration for their money, and it is to be presumed that they bought with knowledge of the law on the subject." ▆ ▆▆▆ In at least two jurisdictions in which the matter has been considered, the fact that the land between high and low water is owned by private parties is held not to prevent the imposition of the public trust to the high water mark. (*State* v. *Korrer, supra*, 148 N.W. 617, 623; *Flisrand* v. *Madson, supra*, 152 N.W. 796, 801.)[20]

▆ We emphasize that Lyon is not deprived of the use of the lands between low and high water, and that he may utilize them in any manner not incompatible with the public's interest in the property.[21]

---

property except from coverage claims of the state to any portion of the property lying within the bed of the lake, any rights of the public for commerce, navigation or fishing, and any adverse claim to lands created by artificial means.

[20]The People raise an additional question regarding the correctness of the trial court's ruling. The court determined that the appropriate boundary between public and private ownership is to be measured in accordance with the "last natural" ordinary low water mark of the lake, i.e., the water level in existence prior to the construction of a dam in 1914. The People argue that the proper standard of measure is the lake in its current condition. This issue is also presented in *State of California* v. *Superior Court (Fogerty)* (1981) *post*, at page 240 [172 Cal.Rptr. 713, 625 P.2d 256], and it is discussed in the opinion in that case. We conclude that the position of the People is correct, and that the determination of the boundary between public and private ownership must be assessed in accordance with the shoreline of the lake as it exists presently.

[21]Lyon has moved to strike the People's "Replication to Answer to Petition for Writ of Mandamus" and an appendix to that brief. The People filed a motion to strike certain portions of the brief of amicus curiae California Land Title Association. These motions are denied.

Let a writ of mandate issue directing the trial court to vacate its order granting Lyon partial summary judgment, and to grant the People's motion for partial summary judgment insofar as consistent with the views expressed above.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**CLARK, J.,** Concurring and Dissenting.—The majority opinion overwhelmingly establishes that by statute, case authority and practice California historically has not claimed title to land between the high and low water marks of inland bodies of water. I thus concur in the majority holding that Lyon has fee title to lands above the low water mark of Clear Lake.

However, I must dissent from the holding that lands lying along navigable streams and lakes between high and low water levels are subject to the tidelands and submerged lands trust. That trust should be limited to tidelands as its name implies—lands covered and uncovered by the flow and ebb of the tide—and submerged lands. Historically, the trust has not been applied to land between high and low water mark on navigable lakes and streams (the shorezone). To the contrary, millions of acres have been reclaimed between high and low water for residential, agricultural, and general governmental uses—uses which would have been and are improper if the trust doctrine is applicable. History establishes it would have been against public policy—greatly impeding the development of the resources of our state—to have applied the trust doctrine. To apply that doctrine for the first time today casts clouds on thousands if not millions of land titles and uses, and jeopardizes agricultural and residential uses of millions of acres which are presently so used and are far more valuable for farm and home than for trust uses. While public recreational and ecological uses of the shorezone are important considerations, the state has and is providing for such uses. Application of the trust to millions of acres historically and presently within the shorezone is overkill, contrary to public policy, and an inequitable infringement on long-settled and vested titles.

I. THE TRUST

The common law trust at issue has repeatedly been described by our courts as applying to tide and submerged lands. (E.g., *City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515, 518-519, fn. 1 [162 Cal.Rptr. 327, 606 P.2d 362]; *Marks v. Whitney* (1971) 6 Cal.3d 251, 257, fn. 1

[98 Cal.Rptr. 790, 491 P.2d 374]; *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 482 [91 Cal.Rptr. 23, 476 P.2d 423]; *San Diego County Archaeological Society Inc.* v. *Compadres* (1978) 81 Cal.App. 3d 923, 925 [146 Cal.Rptr. 786].) The Clear Lake lands now at issue are not tidelands—they are not daily covered and uncovered by the flow and ebb of tide water. (See *Marks* v. *Whitney, supra,* 6 Cal.3d 251, 258; *People* v. *Kerber* (1908) 152 Cal. 731, 733 [93 P. 878].) Unlike tidelands the instant shorezone is uncovered for long periods of time—often the better part of a year. Tidelands unlike the instant lands are covered and uncovered twice each day by salt water, which—unlike the waters of Clear Lake—severely limits use of underlying lands for agricultural purposes. The instant shorezone land is obviously not submerged land.

Before considering historical matters requiring rejection of the majority's extension of the trust to shorezones, we should first consider the trust as it applies to true tide and submerged lands.

Tidelands and submerged lands owned by the state are held in trust for public purposes of navigation, commerce and fisheries. (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 584 [138 P. 79].) Tidelands subject to the trust may not be alienated into absolute private ownership; an attempted conveyance of such land transfers "only bare legal title," and the property remains subject to the public trust easement. (*Id.*) The decisions of this court have established that the trust is a limitation on governmental as well as private reclamation activities. (*City of Long Beach, supra,* 3 Cal.3d 462, 482-486; *Atwood* v. *Hammond* (1935) 4 Cal.2d 31, 38 [48 P.2d 20]; *City of Oakland* v. *Williams* (1929) 206 Cal. 315, 327-328, 330-331 [274 P. 328].)

The uses permitted within the trust are described in *Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259-260 [98 Cal.Rptr. 790, 491 P.2d 374], as follows: "Public trust easements are traditionally defined in terms of navigation, commerce and fisheries. They have been held to include the right to fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom of the navigable waters for anchoring, standing, or other purposes. [Citations.] The public has the same rights in and to tidelands. [¶] The public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs. In administering the trust the state is not burdened with an outmoded classification favoring one mode of uti-

lization over another. [Citations.] There is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area. It is not necessary to here define precisely all the public uses which encumber tidelands."

Permissible uses of tidelands whether by government or private citizens are numerous within the broad terms of the public trust for navigation, commerce, fishing and other purposes. For example, in *City of Oakland* v. *Williams* (1929) 206 Cal. 315, 319-323 [274 P. 328], this court upheld the use of such lands by a private party for a warehouse to be used for shipping, processing, and packing dried fruits. (See *Atwood* v. *Hammond* (1935) 4 Cal.2d 31, 40 [48 P.2d 20].)

Nevertheless, there are certain common land uses which are not included within trust uses, namely, residential, agricultural, and general governmental. Individuals as well as government may enforce the trust. (*Marks* v. *Whitney, supra,* 6 Cal.2d 251, 261-262.)

Reclamation of tidelands does not in and of itself terminate the public trust. (*Marks* v. *Whitney, supra,* 6 Cal.3d 251, 261; *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 483; *Newcomb* v. *City of Newport Beach* (1936) 7 Cal.2d 393, 402 [60 P.2d 825]; *Atwood* v. *Hammond* (1935) 4 Cal.2d 31, 40-41 [48 P.2d 20].) However, if the Legislature finds and determines that particular lands are no longer useful for trust purposes, it may free them from the trust. (*Marks* v. *Whitney, supra,* 6 Cal.3d 251, 260; *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482.) Statutes purporting to terminate the public use will be carefully scanned to determine whether that was the legislative intent. (*City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d 515, 525.)

## II. THE SHOREZONE HISTORICALLY

We were taught in elementary schools that geographical conditions encountered by early settlers of our great California valleys were significantly different from those presently existing. Winter and spring rains and snows melting in the Sierras created great inland seas in the center of California. The width of rivers measured by feet in summer

extended to miles during parts of the spring.[1] While the land regularly covered by water was as rich as any in the world, it could only be effectively farmed after the water receded. The flooding and short growing season limited production of crops and improvements which could be made.

Much of the history of California is tied to reclamation and farming of the state's rich bottom land. Such reclaimed lands have become some of the world's most productive farmland. Other large areas of reclaimed land have been used for urban development. For example, much of Sacramento is built upon reclaimed land. (E.g., *Gray* v. *Reclamation District No. 1500* (1917) 174 Cal. 622, 626-631 [163 P. 1024] (Sacramento and Feather Rivers); *Miller & Lux* v. *Madera Canal etc. Co.* (1909) 155 Cal. 59, 67 et seq. [99 P. 502] (San Joaquin River); *Modoc L. & L. S. Co.* v. *Booth* (1894) 102 Cal. 151, 153 et seq. [36 P. 431] (Pitt River).)

In addition to tracts now protected from flood waters there remain large tracts that—while flooded in winter and spring—are naturally drained and farmed in the summer and fall. For example, the Yolo Basin, which is used during the annual runoff to reduce flood pressure on other areas (see, *Gray* v. *Reclamation District No. 1500, supra*, 174 Cal. 622, 631), is an area of many square miles and is put to productive farm use when the waters recede.

Similarly, not all homes built within the shorezones are free from regular flooding. Thousands of such homes remain, for example, along the Russian River. These shorezone homes are regularly flooded.

The acres of reclaimed land which have been put to productive agricultural and residential use number in the millions. So far as I am

---

[1] Historically, the Sacramento River has carried off the annual spring flow of seasonal rains and melting snows which arise in surrounding mountains. Large basins were formed as vast amounts of water regularly overflowed river banks. During spring seasons, the total basin covered 1,250 square miles and in extraordinary years 1,700 square miles. When spring flood waters evaporated, the most fertile and productive agricultural land was exposed. (See, Rep. of A Board of Engineers Upon Examination of Sacramento, San Joaquin, and Feather Rivers, Cal., H.R. Doc. No. 262, 59th Cong., 1st Sess., p. 6 (1905); Rolle, California: A History (1969) pp. 370-371.) Similarly, the Fresno River (*Miller & Lux* v. *Madera Canal etc. Co.* (1909) 155 Cal. 59, 63-64 [99 P. 502], and the San Joaquin River (*Herminghaus* v. *So. California Edison Co.* (1926) 200 Cal. 81, 87-88 [252 P. 607]) have traditionally overflowed during the spring time to produce large marshland areas, which were subsequently highly productive.

aware, the Legislature has never found or determined such reclaimed lands useless for trust purposes or free of the trust. Indeed, it is by no means clear the Legislature could have found or could now find such reclaimed lands or even the greater portion thereof useless for trust purposes when we remember that among such purposes are recreational and ecological uses. While the lands may be extremely valuable for agricultural and residential purposes, a balancing of values is not the test under the trust doctrine. The test is lack of value for trust purposes. In addition, it must be pointed out that the government exacted a ransom of $783,500 to clear the title of the homeowners in the subdivision in the asserted tidelands area involved in *City of Long Beach* v. *Mansell, supra*, 3 Cal.3d 462, 475.

The history of development of our great agricultural valleys and related residential development is directly in conflict with the asserted common law trust the majority seek to impose.

The majority trust doctrine is not merely in conflict with the private assertion of fee interest to reclaimed lands, but it is abundantly clear the state has encouraged and provided for such uses. One need only examine the three volumes of West Publishing Company's Appendix to our Water Code to note the collection of statutes enacted by our Legislature to establish reclamation districts which were obviously designed to further private agricultural use of reclaimed lands. While such districts may have also furthered navigational purposes on the concerned bodies of waters, it would be unreasonable to conclude that assessments against reclaimed lands to finance the costs of reclamation did not reflect increased values of properties as agricultural lands or that reclamation districts were not created with the intent the lands were to be used for agricultural purposes. Further, numerous municipalities in historical shorezone areas have approved subdivisions for residential development and have provided residential services, all of which activities are in conflict with the majority's trust.

In concluding that in the past 130 years there has been a public policy to maintain land in its natural state or to limit historical shorezones to trust uses, the majority blind themselves to the historical development of controlling law. This law recognizes what highly productive members of our society undertook to forge, not only to serve their needs but also to serve the needs of society with the authorization, approval

and encouragement over the years of our Legislatures, Governors, and local governmental agencies.

Application of the trust doctrine to the shorezone is contrary to California public policy. Rather than precluding farming and residential use of the shorezone, the policy has been to encourage reclamation and farming and residential use of these properties.

Protection of parts of our historic shorezone for the purposes permitted by the trust is a worthy endeavor but it should not be accomplished with a blunderbuss that confiscates thousands—perhaps millions—of titles, and jeopardizes existing use of millions of acres of residential and farm lands. While, as the majority recognize (*State of California* v. *Superior Court* (*Fogerty*) (1981) *post*, p. 240 [172 Cal. Rptr. 713, 625 P.2d 256]), the state must compensate the landowner for improvements should it choose to exercise the trust and take property for park or other purpose, it is not required to compensate for taking the land. From time immemorial landowners within the shorezone have conducted themselves in good faith as if they were owners in fee, and the land (apart from improvements) has been assessed and taxed as in the case of all fees not subject to the state's assertion of a right to take under a trust. To impose the trust at this late date on all property within the shorezone so that the state may take it without payment is confiscation and constitutionally impermissible.

In concluding that the trust doctrine must extend to the shorezone the majority rely mainly upon *Illinois Central Railroad* v̇. *Illinois* (1892) 146 U.S. 387 [36 L.Ed. 1018, 13 S.Ct. 110] where the Supreme Court held that a grant of *submerged* lands in Lake Michigan was subject to the trust. (*Id.*, at p. 452 et seq. [36 L.Ed. at p. 1042 et seq.].) The court expressly recognized that it did not impose a trust on the shorezone. It stated: "If it be ascertained ... and determined that such piers and docks do not extend beyond the point of practicable navigability, the claim of the railroad company to their title and possession will be confirmed; but if they or either of them are found on such inquiry to extend beyond the point of such navigability, then the State will be entitled to a decree that they, or the one thus extended, be abated and removed to the extent shown ...." (*Id.*, at p. 450 [36 L.Ed. at p. 1041].) The court's order was to the same effect. (*Id.*, at p. 464 [36 L.Ed. at pp. 1046-1047].)

Far from serving as authority to extend the trust to freshwater shore-zones, *Illinois Central Railway* reflects it is *only* navigable submerged lands that are subject to the trust.

I would deny mandate.

Richardson, J., concurred.

The petition of real parties in interest Raymond R. Lyon and Margaret L. Lyon for a rehearing was denied April 29, 1981. Richardson, J., was of the opinion that the petition should be granted.